# EXHIBIT

# "B"

Exhibit "B"

IN THE MUNICIPAL COURT OF COLUMBUS

STATE OF GEORGIA

| | | |
|---|---|---|
| WELLS FARGO BANK, N.A. as | § | |
| Trustee for Option One Mortgage | § | |
| Loan Trust 2003-1, | § | |
| | § | |
| Plaintiff, | § | |
| v. | § | CIVIL ACTION |
| | § | FILE NUMBER: MC2013CV5251. |
| PEDRO J. BURGOS | § | |
| and ALL OTHERS, | § | VERIFIED ANSWER & COUNTERCLAIM |
| | § | SPECIAL APPEARANCE BY DEFENDANTS |
| Defendants. | § | DEMAND FOR TRIAL BY JURY |

FILED

MAY 29 2013

MUNICIPAL COURT
MUSCOGEE COUNTY

## ANSWER AND COUNTERCLAIM

COMES NOW, **PEDRO BURGOS** and **ALL OTHERS,** the Defendants and through Special Appearance hereby files their Answer and Counterclaims against the above-named Plaintiff, and shows this Court as follows:

### FIRST DEFENSE

This Court lacks personal jurisdiction over the Defendants because no legal or valid service of process was ever made on Defendant Pedro Burgos and ALL OTHERS Defendants in this action and therefore all other Defendants has not been properly named and joined in this action and therefore service on the Defendant is defective as a matter of law. ALL OTHERS Defendants do not waive service in this matter.

### SECOND DEFENSE

This Court lacks subject-matter jurisdiction over this matter because Wells Fargo Bank as Trustee is not the legal owner of the property and holds no legal or equitable title to the property. See, **Exhibit "A"** attached.

Page 1

## THRID DEFENSE

That this Court lacks subject-matter jurisdiction because the Deed of Under Power filed with the Clerk of the Superior Court of Muscogee County is a forgery because the assignment that is subject to said title is a forgery and therefore Wells Fargo lacks standing to bring such claim because it is not the real party at interest.  See, **Exhibit "B"** attached hereto.

## FOURTH DEFENSE

That the affidavit for writ of possession is false and misleading and is barred due to the unclean hands doctrine because the assignment of the security deed were made illegally and fraudulently without notice to the legal owner, debtor and or tenants of the real property and is therefore a forgery.

## FIFTH DEFENSE

This Court lacks subject-matter jurisdiction over this matter because the Plaintiff has failed to give the Defendants the required (60) day notice to vacate in order to terminate the so-called tenancy at sufferance according to **O.C.G.A. § 44-7-7**.  Therefore, the Defendants waive no notice under **O.C.G.A. § 44-7-7**.

## SIXTH DEFENSE

That Plaintiff in not entitled to a writ of possession of the property because the Plaintiff has failed to give notice and make a demand for possession of the property in violation of Georgia law according to **O.C.G.A. § 44-7-50**.  Therefore this Court lacks subject-matter jurisdiction and the affidavit for writ of possession fails to state a claim for relief as a matter of law.

Page 2

### SEVENTH DEFENSE

That Plaintiff lacks standing to bring this action because Plaintiff is not the real party at interest in this case and therefore the Court lacks subject-matter jurisdiction over this case as a matter of law.

### EIGHTH DEFENSE

The Affidavit for Writ of Possession fails to state a claim in which relief can be granted therefore must be dismissed as a matter of law.

### NINTH DEFENSE

That this Court lacks subject-matter jurisdiction over this case because the claim is not ripe for adjudication because Plaintiff failed to comply with Federal law, **12 U.S.C. § 5201** the Protect of Tenants and Foreclosure Act and therefore fails to state a claim and barred by the doctrine of ripeness.   See, **Exhibit "C"** attached hereto.

### TENTH DEFENSE

The Plaintiff's is not entitled to relief due to the unclean hands doctrine because the Plaintiff through it's officers, agents and attorneys stated in this action, all have unclean hand with respect their dealings with the Defendants in this action because they committed frauds, forgery and misrepresentations against the Defendants.   Thus Plaintiff shall not allowed to benefit from any unlawful actions by and through it's officers, agents, servants and its attorneys acting in concert with the Plaintiff and any requested relief must be denied

## ELEVENTH DEFENSE

The Defendants claims there is no landlord-tenant relationship between the Plaintiff in this dispossessory action and the Defendants and the Defendants demand a trial by jury concerning this issue of fact.

## I. COUNTERCLAIM

**COMES NOW, PEDRO BURGOS** and **ALL OTHERS,** the Defendants and hereby files their counterclaim against the above-named Plaintiff, **WELL FARGO BANK, N.A. as Trustee** and shows this Court as follows:

## II. FACTAUL ALLEGATIONS

1. On December 20th, 2002, Defendant Pedro Burgos conveyed and granted a Security Deed as an interest in the real property know as: 7440 McKee Road, Upatoi, Georgia 30013 over to Option One Mortgage Corporation. See, **Exhibit "A"** attached hereto.

2. That at the time the Security Deed were executed, there was no witness to the deed at the time of closing in violation of **O.C.G.A. 44-14-30**. Therefore, the Security Deed was witnessed days after Defendant Pedro Burgos left the closing of his mortgage loan.  See, **Exhibit "B"** attached hereto.

3. That on November 11th, 2012, the Plaintiff Wells Fargo did received a forged Assignment from Sand Canyon Corporation f/k/a Option One Mortgage Corporation.  That based upon this fraudulent and forged assignment, the

Plaintiff Wells Fargo Bank, N.A. illegally and wrongfully foreclosed on Defendant Pedro Burgos and ALL OTHERS' property rights.

4. Defendants and ALL Others aver that their tenant Samuel Copland has a lease agreement with Defendant Pedro Burgos and that Mr. Copland as a matter of law is entitled to stay on the property until the terms of his lease has expired or not less than the (90) days as required by Federal law.

5. Thus the Plaintiff in this action according to Georgia law is in clear violation of Federal law, Title VII of the Protection of Tenants Foreclosure Act.

6. The Plaintiff through its action officers and agents committed fraud and misrepresentations against the Defendants through by the filing false and fraudulent documents with the Superior Court of Muscogee County.

7. These fraudulent documents are illegal and caused damages to the Defendants by the Plaintiff and its his officers, agents and attorneys such damages are embarrassment; humiliation and mental anguish.

8. Therefore, Defendants moves this Court and the jury for a verdict and judgment in amount not less than **$100,000.00** in damages for embarrassment; humiliation and mental anguish cause by Plaintiff.

9. As a direct result of Plaintiff's actions; fraudulent and forged documents and Plaintiff's illegal actions done to the Defendants through Plaintiff's officers, agents, servants and attorneys, the Plaintiff, its officers, agents and attorneys breach the terms of the Security Deed of when Plaintiff failed to give to the Defendants a Notice of Default as required under the terms

of the Security Deed at ¶ 21.   This breach clearly affected the rights of the Defendants.  See, all **Exhibits** attached hereto.

10. Therefore, Plaintiff's actions and breach of the terms of the Security Deed caused damages to the Defendants in this case in the amount of **$450,000.00** because the Plaintiff's officer, agents and attorneys denied the Defendants of their rights to use and enjoy the property free from eviction which is the subject of this action.  See Security Deed at ¶ 21 attached.

### III. FIRST CAUSE OF ACTION

11.  First, the foreclosure sale and deed of the property conducted by Wells Fargo Bank, N.A., is void because Plaintiff had not power of attorney to conduct the sale as attorney in fact because Option One Mortgage Corporation had no legal Security Deed and due to said assignment is a forgery.

12.  Secondly, the foreclosure sale of the property on December 4th, 2012 conducted by Wells Fargo Bank of America, N.A., is void because the bank did comply with **O.C.G.A. § 10-6-6(b)**.

13. Under Georgia law the banks were required to make an affidavit of default and filing the same with the Clerk of Court and serve upon debtor Patricia Williams as owner before they could excised the conditional power of attorney contained in the Security Deed. See, **O.C.G.A. § 10-6-6(b)**.

14. Thus the power of sale authority could not become effective until said affidavit of default is made, filed and served upon the debtor or owner.

Page 6

15. Without such affidavit in compliance with Georgia law, **O.C.G.A. § 10-6-6(b)**, the right to act under the power of sale in the deed did not become effective until an affidavit is made, filed and served upon all debtors.

16. Therefore, Wells Fargo Bank, N.A. never had the legal authority or the contractual authority to conduct a non-judicial sale of Defendant Pedro Burgos' property without an affidavit of default and the foreclosure sale including the deed under power is void as a matter of law.

17.   Third, the foreclosure sale of the property on conducted by Wells Fargo Bank, N.A.is void because it violated **O.C.G.A. § 10-6-24**.

17. Under Georgia, without the express consent of the principle or owner of property, a bank in the foreclosure sale of property cannot be both the seller and the buyer of property at the foreclosure sale.  See, **O.C.G.A. § 10-6-24**.

18. Thus the foreclosure sale by Wells Fargo Bank, N.A. was conducted by Wells Fargo Bank and the buyer at the sale was the Plaintiff.

19. Without the consent from the Defendant in compliance with Georgia law, **O.C.G.A. § 10-6-24,** the sale and deed under power is void.

20.   Therefore, Wells Fargo never had the legal authority or the contractual authority to conduct a non-judicial sale of Defendant's property and the foreclosure sale by Plaintiff is legally void as a matter of law.

21. Forth, the foreclosure sale of the property conducted by the Plaintiff, is void because the bank was required by law to foreclose by judicial means rather than non-judicial because the power of sale provision in the Security

Page 7

Deed at ¶ 21 was not applicable to Defendants and because he were no longer a party to the Security Deed.

22. Therefore, Wells Fargo Bank never had the legal authority or the contractual authority to conduct a non-judicial sale of the property and the foreclosure sale by the Plaintiff as Trustee is legally void as a matter of law.

23. Finally, the foreclosure sale of the property conducted by Wells Fargo Bank is void because the Security Deed is a forgery because no witness ever witnessed the deed at the time Defendant, Pedro J. Burgos signed said deed.

## IV. SECOUND CAUSE OF ACTION
### (GEORGIA AND FEDERAL RICO RACKETEERING)

24. The Defendants repeats, re-allege and incorporates by reference paragraphs one though forty **1-23** as stated in this Counterclaim.

25. The Plaintiff has intentionally violated **O.C.G.A. § 16-14-1** of the Georgia Racketeer Influenced and Corrupt Organization by doing the following:

26. The knowing and the intentional failure of the Plaintiff and its officers and agents to disclose material facts about the illegal foreclosures of Defendant's leased property and with deliberate misrepresentations of material facts in conjunction with Plaintiff's theft by conversion.

27. Defendants has loss their property rights due to Plaintiff and its officers, agents and attorneys' illegal acts; fraudulent assignment of Plaintiff's property and the wrongful foreclosure sale of real property constitute theft by conversion as described herein and constitute repeated violations of **O.C.G.A. § 16-8-1** relating to thefts under.

28. The Plaintiff have allowed its officers, agents and attorneys to commit theft by conversion and theft by deception through repeated acts of fraudulent assignments in violation of **O.C.G.A. § 16-9-1**(relating to forgery in the first degree) which constitute acts of racketeering. See, O.C.G.A. § 16-14-2(9)(2)(viii).

29. These fraudulent and wrongful foreclosures are clearly acts of theft by conversion and further constituted acts of racketeering activity as that term is defined pursuant to **O.C.G.A. § 16-14-3(9)(A)(viii)**.

30. The Plaintiff either conducted and or participated in the conduct of each enterprises through the above described pattern of racketeering activity in violation of **O.C.G.A. § 16-14-1**.

31. The Plaintiff conspired with its managers, officers, agents and attorneys by acquiring and maintaining an interest in real property and was in total control of their actions which violated **O.C.G.A. § 16-14-6(a)(b)(c)**.

32. The Plaintiff did unlawfully through a pattern of racketeering activity and by using the proceeds derived therefrom such illegal activity, acquired and maintained, directly or indirectly an interest in or control of such enterprise and other real and personal property of any nature, including money.

33. The Plaintiff also intentionally and unlawfully obtained real property and proceeds from the Defendant and others like it through a pattern of racketeering activity in this State.

34. The Plaintiff has also illegally acquired and maintain control some direct control over the banks identified herein this Counterclaim with others whose names are both known and unknown to the Defendants stated herein.

35. This may include members and associates of the Plaintiff's law firms whose names are also known and unknown to the Defendants at this time.

36. The Plaintiff did unlawfully, knowingly and intentionally acquired an interest in and control of the aforementioned enterprises which was engaged in a pattern of racketeering activity in violation of **18 U.S.C. § 1962(a)(b)(c)(d)**.

37. The Plaintiff's methods and means and its co-conspirators named herein, has unlawfully, knowingly and intentionally acquired and maintained, directly and indirectly, an interest in and control of the aforementioned enterprise through a wide spread pattern of racketeering activity through the manner and means set forth in this Complaint.  Defendants had a conspiracy to acquire and maintain control of dummy corporations in this State.

38. The Plaintiff and its agents have all failed to exercise appropriate oversight, management supervision and corporate governance, and have failed to devote adequate financial, staffing, training, and legal resources to ensure proper administration and delivery of services and thus committed mail and wire fraud in violation of the Georgia RICO statute **O.C.G.A. § 16-14-6(a)(b)(c).**

39. The Plaintiff and its officers, agents, employees and its attorneys have and all failed to establish and maintain adequate internal controls, policies, and procedures, compliance risk management, and internal audit and

reporting requirements with respect to the administration and delivery of services to the Plaintiff and thus committed mail and wire fraud in violation of the RICO statute **O.C.G.A. § 16-14-6(a)(b)(c);**

40. By reason of the illegal conduct set forth above, the Plaintiff clearly has engaged in illegal and unsafe or unsound practices thus committed mail and wire fraud in violation of **18 U.S.C. § 1964(a)(b)(c)(d)**.

50. The Plaintiff, Wells Fargo Bank and its officers, agents and attorneys all used the United States Mails to violate **18 U.S.C. § 1341** through repeated acts of mail fraud against the Plaintiff by sending false and misleading documents through the U.S. Mails such as assignments of deeds.

### IV. CLAIM FOR RELIEF

51. The Defendants repeat, re-allege and incorporates by reference paragraphs **1-21** as stated herein this Counterclaim.

52. In addition to the compensatory damages of **$150,000.00** requested by all Defendants and hereby seeks punitive damages of **$500,000.00.**

53. Defendants, ALL OTHERS hereby request and demands a declaratory judgment pursuant to **O.C.G.A. § 9-4-1** declaring that the foreclosure sale was wrongful and void as a matter of law and further declaring that all acts committed by the Plaintiff, its officers, agents and attorneys against the Defendants violated the Georgia law, **O.C.G.A. § 10-6-6(b)** and was a fraud upon these Defendants.

54.   Defendants and ALL OTHERS hereby request and demands a permanent injunction pursuant to **O.C.G.A. § 9-5-1** enjoining the Plaintiff from all acts committed by its officers, agents and attorneys against the Defendants that violated the Georgia law, was a fraud upon these Defendants.

### V. DEMAND FOR TRIAL BY JURY

55. The Defendants repeat, re-allege and incorporates by reference paragraphs **1-54** as stated herein this counterclaim.

56. The Defendants hereby demands a trial by jury on all issues of fact pursuant to Georgia law, **O.C.G.A. § 9-11-40** in a Court of record and according to the Georgia Constitution and the United States Constitution demand a trial by jury as a matter of right.

### VI. DEFENDANTS' PRAYER FOR RELIEF

**WHEREFORE,** the Defendants hereby pray and demand full Judgment against the Plaintiff for relief to the Defendants stated as follows:

1. Compensatory Damages in the amount of **($350,000.00)** for Plaintiff's fraud, wonton, gross negligence, willful misconduct, property damages, loss of property rights, embarrassment, humiliation and mental anguish because of Plaintiff's total disregard of the law.

2. Punitive Damages in the amount of **($500,000.00)** for Plaintiff's frauds, wonton, gross negligence, willful misconduct, property damages, loss of property rights, embarrassment, humiliation and mental anguish because of Plaintiff's total disregard of the law.

3. That the Court awards all attorney fees to the Defendants pursuant to law, plus pre interest judgment at legal rate of **(12%)** per annum from December 4TH, 2012 until final judgment is entered in this action, plus all Court costs.

4. All Defendants demands that this Court to transfer this case to the Municipal Court of Columbus to resolve any matter in Defendants' counterclaim and or dismiss this case;

5. That the Defendants be entitled to a trial by jury as a matter of right.

**Respectfully submitted this the** _29th_ **, day of May 2013.**

Jointly Filed and Served by:

**Pedro Burgos, PRO SE**
**Attorney for the Defendant**

**Tony L. Ware, PhD, JD, PRO SE**
**Attorney for the Defendant**

**7440 McKee Road**
**Upatoi, Georgia 31829**
**(706) 332-6881**

Page 13

## VERIFICATION

**PERSONALLY APPEARED** before me, the undersigned attesting officer duly authorized by law to administer oaths is, **PEDRO BURGOS** action after being duly sworn in deposes, states under oath the following:

1. My name is **PEBRO BURGOS** in the above-stated matter.

2. I hereby certify under oath that pursuant to O.C.G.A. § 9-10-111, the information contained in the answer and counterclaim is made true and is made on my personal knowledge, information and belief.

**IN WITNESS AND TESTIMONY HEREOF,** This verification is entered under Georgia law and is true and correct and based upon my personal knowledge, information and belief.  Furthermore, the information and evidence made in this affidavit and the pleadings is based upon my personal knowledge.

**FURTHER AFFIANT SAYTH NOT.**

This _____29th_____ , day of_____May_____ , 2013.

Respectfully Submitted,

_Pedro Burgos_

Pedro Burgos, Affiant

**CERTIFICATE OF NOTARY PUBLIC**
Sworn to and Subscribed before Me,
This _27th_ day of _May_ 2013.

_____
NOTARY PUBLIC

Page 14

# EXHIBIT

## "A"

Exhibit "A"

Deed Book  6630 Pg  148
Filed and Recorded Dec-27-2002 02:13pm
2002-0050812
Georgia Intangible Tax Paid $399.00
M. Linda Pierce
Clerk of Superior Court
Muscogee County County, Georgia

Return to:
O. Wayne Spence, P.C.
2945 Gardenia Street
Columbus, Georgia 31906

AFTER RECORDATION RETURN TO:
OPTION ONE MORTGAGE CORPORATION
P.O. BOX 57096
IRVINE, CA 92619-7096

ATTN:  QUALITY CONTROL

Loan Number: 051044763
Servicing Number: 102907-1            [Space Above This Line For Recording Data]

_____

## SECURITY DEED

THIS SECURITY DEED ("Security Instrument") is given on      December 20, 2002        . The grantor is
PEDRO BURGOS

("Borrower"). This Security Instrument is given to
          Option One Mortgage Corporation, a California Corporation

which is organized and existing under the laws of                CALIFORNIA              , and whose
address is
    3 Ada, Irvine, CA  92618

("Lender"). Borrower owes Lender the principal sum of
ONE HUNDRED THIRTY THREE THOUSAND
          . . .AND NO/100ths          Dollars (U.S. $133,000.00    ).
This debt is evidenced by Borrower's note dated the same date as this Security Instrument ("Note"), which provides for monthly
payments, with the full debt, if not paid earlier, due and payable on      January 01, 2033                    .
This Security Instrument secures to Lender: (a) the repayment of the debt evidenced by the Note, with interest, and all renewals,
extensions and modifications of the Note; (b) the payment of all other sums, with interest, advanced under paragraph 7 to protect
the security of this Security Instrument; and (c) the performance of Borrower's covenants and agreements under this Security
Instrument and the Note. For this purpose, Borrower does hereby grant and convey to Lender and Lender's successors and assigns,
with power of sale, the following described property located in            Muscogee            County, Georgia:
148-002-001A

SEE LEGAL DESCRIPTION ATTACHED HERETO AND MADE A PART THEREOF.

which has the address of    7440   MCKEE ROAD, UPATOI
                                                                                          [Street, City],
Georgia        31829-1712          ("Property Address");
              [Zip Code]

GEORGIA-Single Family
Page 1 of 6                                                                    GAD10011 (07-29-98)

Loan Number:   051044763        Servicing Number:   102907-1

Deed Book   6630 Pg   149

TO HAVE AND TO HOLD this property unto Lender and Lender's successors and assigns, forever, together with all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property."

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

COVENANTS. Borrower and Lender covenant and agree as follows:

1. **Payment of Principal and Interest; Prepayment and Late Charges.** Borrower shall promptly pay when due the principal of and interest on the debt evidenced by the Note and any prepayment and late charges due under the Note.

2. **Funds for Taxes and Insurance.** Subject to applicable law or to a written waiver by Lender, Borrower shall pay to Lender on the day monthly payments are due under the Note, until the Note is paid in full, a sum ("Funds") for: (a) yearly taxes and assessments which may attain priority over this Security Instrument as a lien on the Property; (b) yearly leasehold payments or ground rents on the Property, if any; (c) yearly hazard or property insurance premiums; (d) yearly flood insurance premiums, if any; (e) yearly mortgage insurance premiums, if any; and (f) any sums payable by Borrower to Lender, in accordance with the provisions of paragraph 8, in lieu of the payment of mortgage insurance premiums. These items are called "Escrow Items." Lender may, at any time, collect and hold Funds in an amount not to exceed the maximum amount a lender for a federally related mortgage loan may require for Borrower's escrow account under the federal Real Estate Settlement Procedures Act of 1974 as amended from time to time, 12 U.S.C. Section 2601 et seq. ("RESPA"), unless another law that applies to the Funds sets a lesser amount. If so, Lender may, at any time, collect and hold Funds in an amount not to exceed the lesser amount. Lender may estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with applicable law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is such an institution) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items. Lender may not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and applicable law permits Lender to make such a charge. However, Lender may require Borrower to pay a one-time charge for an independent real estate tax reporting service used by Lender in connection with this loan, unless applicable law provides otherwise. Unless an agreement is made or applicable law requires interest to be paid, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender may agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds, showing credits and debits to the Funds and the purpose for which each debit to the Funds was made. The Funds are pledged as additional security for all sums secured by this Security Instrument.

If the Funds held by Lender exceed the amounts permitted to be held by applicable law, Lender shall account to Borrower for the excess Funds in accordance with the requirements of applicable law. If the amount of the Funds held by Lender at any time is not sufficient to pay the Escrow Items when due, Lender may so notify Borrower in writing, and, in such case Borrower shall pay to Lender the amount necessary to make up the deficiency. Borrower shall make up the deficiency in no more than twelve monthly payments, at Lender's sole discretion.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender. If, under paragraph 21, Lender shall acquire or sell the Property, Lender, prior to the acquisition or sale of the Property, shall apply any Funds held by Lender at the time of acquisition or sale as a credit against the sums secured by this Security Instrument.

3. **Application of Payments.** Unless applicable law provides otherwise, all payments received by Lender under paragraphs 1 and 2 shall be applied: first, to any prepayment charges due under the Note; second, to amounts payable under paragraph 2; third, to interest due; fourth, to principal due; and last, to any late charges due under the Note.

4. **Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines and impositions attributable to the Property which may attain priority over this Security Instrument, and leasehold payments or ground rents, if any. Borrower shall pay these obligations in the manner provided in paragraph 2, or if not paid in that manner, Borrower shall pay them on time directly to the person owed payment. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this paragraph. If Borrower makes these payments directly, Borrower shall promptly furnish to Lender receipts evidencing the payments.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender; (b) contests in good faith the lien by, or defends against enforcement of the lien in, legal proceedings which in the Lender's opinion operate to prevent the enforcement of the lien; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which may attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Borrower shall satisfy the lien or take one or more of the actions set forth above within 10 days of the giving of notice.

5. **Hazard or Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage" and any other hazards, including floods or flooding, for which Lender requires insurance. This insurance shall be maintained in the amounts and for the periods that Lender requires. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's approval which shall not be unreasonably withheld. If Borrower fails to maintain coverage described above, Lender may, at Lender's option, obtain coverage to protect Lender's rights in the Property in accordance with paragraph 7.

All insurance policies and renewals shall be acceptable to Lender and shall include a standard mortgage clause. Lender shall have the right to hold the policies and renewals. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower.

Unless Lender and Borrower otherwise agree in writing, or applicable Law otherwise requires, insurance proceeds shall be applied first to reimburse Lender for costs and expenses incurred in connection with obtaining any such insurance proceeds, and then, at Lender's option, in such order and proportion as Lender may determine in its sole and absolute discretion, and regardless of any impairment of security or lack thereof: (i) to the sums secured by this Security Instrument, whether or not then due, and to such components thereof as Lender may determine in its sole and absolute discretion; and/or (ii) to Borrower to pay the costs and expenses of necessary repairs or restoration of the Property to a condition satisfactory to Lender. If Borrower abandons the Property, or does not answer within 30 days a notice from Lender that the insurance carrier has offered to settle a claim, Lender

GAD10012 (07-29-98)

Loan Number:   051044763        Servicing Number:   102907-1

may collect the insurance proceeds. Lender may, in its sole and absolute discretion, and regardless of any impairment of security or lack thereof, use the proceeds to repair or restore the Property or to pay the sums secured by this Security Instrument, whether or not then due. The 30-day period will begin when the notice is given.

Unless Lender and Borrower otherwise agree in writing, any application of proceeds to principal shall not extend or postpone the due date of the monthly payments referred to in paragraphs 1 and 2 or change the amount of the payments. If under paragraph 21 the Property is acquired by Lender, Borrower's right to any insurance policies and proceeds resulting from damage to the Property prior to the acquisition shall pass to Lender to the extent of the sums secured by this Security Instrument immediately prior to the acquisition.

If Borrower obtains earthquake insurance, any other hazard insurance, or any other insurance on the Property and such insurance is not specifically required by Lender, then such insurance shall (i) name Lender as loss payee thereunder, and (ii) be subject to the provisions of this paragraph 5.

6. Occupancy, Preservation, Maintenance and Protection of the Property; Borrower's Loan Application; Leaseholds. Borrower acknowledges that the Lender does not desire to make a loan to Borrower secured by this property on the terms contained in the Note unless the property is to be occupied by Borrower as Borrower's primary/secondary residence. Lender makes non-owner residence loans of different terms. Borrower promises and assures Lender that Borrower intends to occupy this property as Borrower's primary/secondary residence  and that Borrower will so occupy this property as its sole primary/secondary residence within sixty (60) days after the date of the Security Instrument. If Borrower breaches this promise to occupy the property as Borrower's primary/secondary residence, then Lender may invoke any of the following remedies, in addition to the remedies provided in the Security Instrument; (1) Declare all sums secured by the Security Instrument due and payable and foreclose the Security Instrument, (2) Decrease the term of the loan and adjust the monthly payments under the Note accordingly, increase the interest rate and adjust the monthly payments under the Note accordingly, or (3) require that the principal balance be reduced to a percentage of either the original purchase price or the appraised value then being offered on non-owner occupied loans.

Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate, or commit waste on the Property. Borrower shall be in default if any forfeiture action or proceeding, whether civil or criminal, is begun that in Lender's good faith judgment could result in forfeiture of the Property or otherwise materially impair the lien created by this Security Instrument or Lender's security interest. Borrower may cure such a default and reinstate, as provided in paragraph 18, by causing the action or proceeding to be dismissed with a ruling that, in Lender's good faith determination, precludes forfeiture of the Borrower's interest in the Property or other material impairment of the lien created by this Security Instrument or Lender's security interest. Borrower shall also be in default if Borrower, during the loan application process, gave materially false or inaccurate information or statements to Lender (or failed to provide Lender with any material information) in connection with the loan evidenced by the Note, including, but not limited to, representations concerning Borrower's occupancy of the Property as a principal residence. If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

Borrower shall, at Borrower's own expense, appear in and defend any action or proceeding purporting to affect the Property or any portion thereof or Borrower's title thereto, the validity or priority of the lien created by this Security Instrument, or the rights or powers of Lender with respect to this Security Instrument or the Property. All causes of action of Borrower, whether accrued before or after the date of this Security Instrument, for damage or injury to the Property or any part thereof, or in connection with any transaction financed in whole or in part by the proceeds of the Note or any other note secured by this Security Instrument, by Lender, or in connection with or affecting the Property or any part thereof, including causes of action arising in tort or contract and causes of action for fraud or concealment of a material fact, are, at Lender's option, assigned to Lender, and the proceeds thereof shall be paid directly to Lender who, after deducting therefrom all its expenses, including reasonable attorneys' fees, may apply such proceeds to the sums secured by this Security Instrument or to any deficiency under this Security Instrument or may release any monies so received by it or any part thereof, as Lender may elect. Lender may, at its option, appear in and prosecute in its own name any action or proceeding to enforce any such cause of action and may make any compromise or settlement thereof. Borrower agrees to execute such further assignments and any other instruments as from time to time may be necessary to effectuate the foregoing provisions and as Lender shall request.

7. Protection of Lender's Rights in the Property. If Borrower fails to perform the covenants and agreements contained in this Security Instrument, or there is a legal proceeding that may significantly affect Lender's rights in the Property (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture or to enforce laws or regulations), then Lender may do and pay for whatever is necessary to protect the value of the Property and Lender's rights in the Property. Lender's actions may include paying any sums secured by a lien which has priority over this Security Instrument, appearing in court, paying reasonable attorneys' fees and entering on the Property to make repairs. Although Lender may take action under this paragraph 7, Lender does not have to do so.

Any amounts disbursed by Lender under this paragraph 7 shall become additional debt of Borrower secured by this Security Instrument. Unless Borrower and Lender agree to other terms of payment, these amounts shall bear interest from the date of disbursement at the Note rate in effect from time to time and shall be payable, with interest, upon notice from Lender to Borrower requesting payment.

8. Mortgage Insurance. If Lender required mortgage insurance as a condition of making the loan secured by this Security Instrument, Borrower shall pay the premiums required to maintain the mortgage insurance in effect. If, for any reason, the mortgage insurance coverage required by Lender lapses or ceases to be in effect, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the mortgage insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the mortgage insurance previously in effect, from an alternate mortgage insurer approved by Lender. If substantially equivalent mortgage insurance coverage is not available, Borrower shall pay to Lender each month a sum equal to one-twelfth of the yearly mortgage insurance premium being paid by Borrower when the insurance coverage lapsed or ceased to be in effect. Lender will accept, use and retain these payments as a loss reserve in lieu of mortgage insurance. Loss reserve payments may no longer be required, at the option of Lender, if mortgage insurance coverage (in the amount and for the period that Lender requires) provided by an insurer approved by Lender again becomes available and is obtained. Borrower shall pay the premiums required to maintain mortgage insurance in effect, or to provide a loss reserve, until the requirement for mortgage insurance ends in accordance with any written agreement between Borrower and Lender or applicable law.

9. Inspection. Lender or its agent may make reasonable entries upon and inspections of the Property. Lender shall give Borrower notice at the time of or prior to an inspection specifying reasonable cause for the inspection.

10. Condemnation. The proceeds of any award or claim for damages, direct or consequential, in connection with any condemnation or other taking of any part of the Property, or for conveyance in lieu of condemnation, are hereby assigned and shall

Loan Number:   051044763          Servicing Number:   102907-1

be paid to Lender. Lender may apply, use or release the condemnation proceeds in the same manner as provided in paragraph 5 hereof with respect to insurance proceeds.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the condemnor offers to make an award or settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the proceeds, at its option, either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due.

Unless Lender and Borrower otherwise agree in writing, any application of proceeds to principal shall not extend or postpone the due date of the monthly payments referred to in paragraphs 1 and 2 or change the amount of such payments.

11. **Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to any successor in interest of Borrower shall not operate to release the liability of the original Borrower or Borrower's successors in interest. Lender shall not be required to commence proceedings against any successor in interest or refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or Borrower's successors in interest. Any forbearance by Lender in exercising any right or remedy shall not be a waiver of or preclude the exercise of any right or remedy.

12. **Successors and Assigns Bound; Joint and Several Liability; Co-signers.** The covenants and agreements of this Security Instrument shall bind and benefit the successors and assigns of Lender and Borrower, subject to the provisions of paragraph 17. Borrower's covenants and agreements shall be joint and several. Any Borrower who co-signs this Security Instrument but does not execute the Note: (a) is co-signing this Security Instrument only to mortgage, grant and convey that Borrower's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower may agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without that Borrower's consent.

13. **Loan Charges.** If the loan secured by this Security Instrument is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge under the Note.

14. **Notices.** Any notice to Borrower provided for in this Security Instrument shall be given by delivering it or by mailing it by first class mail unless applicable law requires use of another method. The notice shall be directed to the Property Address or any other address Borrower designates by notice to Lender. Any notice to Lender shall be given by first class mail to Lender's address stated herein or any other address Lender designates by notice to Borrower. Any notice provided for in this Security Instrument shall be deemed to have been given to Borrower or Lender when given as provided in this paragraph.

15. **Governing Law; Severability.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. In the event that any provision or clause of this Security Instrument or the Note conflicts with applicable law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision. To this end the provisions of this Security Instrument and the Note are declared to be severable.

16. **Borrower's Copy.** Borrower shall be given one conformed copy of the Note and of this Security Instrument.

17. **Transfer of the Property or a Beneficial Interest in Borrower.** If all or any part of the Property or any interest in it is sold or transferred (or if a beneficial interest in Borrower is sold or transferred and Borrower is not a natural person) without Lender's prior written consent, Lender may, at its option, require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if exercise is prohibited by federal law as of the date of this Security Instrument.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is delivered or mailed within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

18. **Borrower's Right to Reinstate.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earlier of: (a) 5 days (or such other period as applicable law may specify for reinstatement) before sale of the Property pursuant to any power of sale contained in this Security Instrument; or (b) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees; and (d) takes such action as Lender may reasonably require to assure that the lien of this Security Instrument, Lender's rights in the Property and Borrower's obligation to pay the sums secured by this Security Instrument shall continue unchanged. Upon reinstatement by Borrower, this Security Instrument and the obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under paragraph 17.

19. **Sale of Note; Change of Loan Servicer.** The Note or a partial interest in the Note (together with this Security Instrument) may be sold one or more times without prior notice to Borrower. A sale may result in a change in the entity (known as the "Loan Servicer") that collects monthly payments due under the Note and this Security Instrument. There also may be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change in accordance with paragraph 14 above and applicable law. The notice will state the name and address of the new Loan Servicer and the address to which payments should be made. The notice will also contain any other information required by applicable law. The holder of the Note and this Security Instrument shall be deemed to be the Lender hereunder.

20. **Hazardous Substances.** Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property that is in violation of any Environmental Law. The preceding two sentences shall not apply to the presence, use, or storage on the Property, of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property.

Borrower shall promptly give Lender written notice of any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law

GAD10014 (07-29-98)

of which Borrower has actual knowledge. If Borrower learns, or is notified by any governmental or regulatory authority, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law.

Borrower shall be solely responsible for, shall indemnify, defend and hold harmless Lender, its directors, officers, employees, attorneys, agents, and their respective successors and assigns, from and against any and all claims, demands, causes of action, loss, damage, cost (including actual attorneys' fees and court costs and costs of any required or necessary repair, cleanup or detoxification of the Property and the preparation and implementation of any closure, abatement, containment, remedial or other required plan), expenses and liability directly or indirectly arising out of or attributable to (a) the use, generation, storage, release, threatened release, discharge, disposal, abatement or presence of Hazardous Substances on, under or about the Property, (b) the transport to or from the Property of any Hazardous Substances, (c) the violation of any Hazardous Substances law, and (d) any Hazardous Substances claims.

As used in this paragraph 20, "Hazardous Substances" are those substances defined as toxic or hazardous substances by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials. As used in this paragraph 20, "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection.

ADDITIONAL COVENANTS. Borrower and Lender further covenant and agree as follows:

21. Acceleration; Remedies. If any installment under the Note or notes secured hereby is not paid when due, or if Borrower should be in default under any provision of this Security Instrument, or if Borrower is in default under any other security deed or other instrument secured by this Security Instrument, all sums secured by this Security Instrument and accrued interest thereon shall at once become due and payable at the option of Lender without prior notice, except as otherwise required by applicable law, and regardless of any prior forbearance. In such event, Lender, at its option, and subject to applicable law, may then or thereafter invoke the power of sale and/or any other remedies or take any other actions permitted by applicable law. Lender will collect all expenses incurred in pursuing the remedies described in this Paragraph 21, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

If Lender invokes the power of sale, Lender shall give a copy of a notice of sale to Borrower in the manner provided in paragraph 14 and shall give notice of sale by public advertisement for the time and in the manner prescribed by applicable law. Lender, without further demand on Borrower, shall sell the Property at public auction to the highest bidder at the time and place and under the terms designated in the notice of sale in one or more parcels and in any order Lender determines. Lender or its designee may purchase the Property at any sale.

Lender shall convey to the purchaser indefeasible title to the property, and Borrower hereby appoints Lender Borrower's agent and attorney-in-fact to make such conveyance. The recitals in the Lender's deed shall be prima facie evidence of the truth of the statements made therein. Borrower covenants and agrees that Lender shall apply the proceeds of the sale in the following order: (a) to all expenses of the sale, including, but not limited to, reasonable attorneys' fees; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it. The power and agency granted are coupled with an interest, are irrevocable by death or otherwise and are cumulative to the remedies for collection of debt as provided by law.

If the Property is sold pursuant to this paragraph 21, Borrower, or any person holding possession of the Property through Borrower, shall immediately surrender possession of the Property to the purchaser at the sale. If possession is not surrendered, Borrower or such person shall be a tenant holding over and may be dispossessed in accordance with applicable law.

22. Release. Upon payment of all sums secured by this Security Instrument, Lender shall release this property without warranty to the person or persons legally entitled to it. Such person or persons shall pay any recordation costs. Lender may charge such person or persons a fee for releasing the Property for services rendered if the charging of the fee is permitted under applicable law.

23. Waiver of Homestead. Borrower waives all rights of homestead exemption in the Property.

24. Assumption not a Novation. Lender's acceptance of an assumption of the obligations of this Security Instrument and the Note, and any release of Borrower in connection therewith, shall not constitute a novation.

25. Security Deed. This conveyance is to be construed under the existing laws of the State of Georgia as a deed passing title, and not as a mortgage, and is intended to secure the payment of all sums secured hereby.

26. Misrepresentation and Nondisclosure. Borrower has made certain written representations and disclosures in order to induce Lender to make the loan evidenced by the Note or notes which this Security Instrument secures, and in the event that Borrower has made any material misrepresentation or failed to disclose any material fact, Lender, at its option and without prior notice or demand, shall have the right to declare the indebtedness secured by this Security Instrument, irrespective of the maturity date specified in the Note or notes secured by this Security Instrument, immediately due and payable.

27. Time is of the Essence. Time is of the essence in the performance of each provision of this Security Instrument.

28. Waiver of Statute of Limitations. The pleading of the statute of limitations as a defense to enforcement of this Security Instrument, or any and all obligations referred to herein or secured hereby, is hereby waived to the fullest extent permitted by applicable law.

29. Modification. This Security Instrument may be modified or amended only by an agreement in writing signed by Borrower and Lender.

30. Reimbursement. To the extent permitted by applicable law, Borrower shall reimburse Trustee and Lender for any and all costs, fees and expenses which either may incur, expend or sustain in the execution of the trust created hereunder or in the performance of any act required or permitted hereunder or by law or in equity or otherwise arising out of or in connection with this Security Instrument, the Note, any other note secured by this Security Instrument or any other instrument executed by Borrower in connection with the Note or Security Instrument. To the extent permitted by applicable law, Borrower shall pay to Trustee and Lender their fees in connection with Trustee and Lender including, but not limited to assumption application fees; fees for payoff demands and, statements of loan balance; fees for making, transmitting and transporting copies of loan documents, verifications, full or partial lien releases and other documents requested by borrower or necessary for performance of Lender's rights or duties under this Security Instrument; fees arising from a returned or dishonored check; fees to determine whether the Property is occupied, protected, maintained or insured or related purposes; appraisal fees, inspection fees, legal fees, broker fees, insurance mid-term substitutions, repair expenses, foreclosure fees and costs arising from foreclosure of the Property and protection of the security for this Security Instrument; and all other fees and costs of a similar nature not otherwise prohibited by law.

GAD10015 (07-29-98)

Loan Number:    051044763        Servicing Number:    102907-1

Deed Book  6630 Pg  153

31. **Clerical Error.** In the event Lender at any time discovers that the Note, any other note secured by this Security Instrument, the Security Instrument, or any other document or instrument executed in connection with the Security Instrument, Note or notes contains an error that was caused by a clerical mistake, calculation error, computer malfunction, printing error or similar error, Borrower agrees, upon notice from Lender, to reexecute any documents that are necessary to correct any such error(s). Borrower further agrees that Lender will not be liable to Borrower for any damages incurred by Borrower that are directly or indirectly caused by any such error.

32. **Lost, Stolen, Destroyed or Mutilated Security Instrument and Other Documents.** In the event of the loss, theft or destruction of the Note, any other note secured by this Security Instrument, the Security Instrument or any other documents or instruments executed in connection with the Security Instrument, Note or notes (collectively, the "Loan Documents"), upon Borrower's receipt of an indemnification executed in favor of Borrower by Lender, or, in the event of the mutilation of any of the Loan Documents, upon Lender's surrender to Borrower of the mutilated Loan Document, Borrower shall execute and deliver to Lender a Loan Document in form and content identical to, and to serve as a replacement of, the lost, stolen, destroyed, or mutilated Loan document, and such replacement shall have the same force and effect as the lost, stolen, destroyed, or mutilated Loan Documents, and may be treated for all purposes as the original copy of such Loan Document.

33. **Assignment of Rents.** As additional security hereunder, Borrower hereby assigns to Lender the rents of the Property. Borrower shall have the right to collect and retain the rents of the Property as they become due and payable provided Lender has not exercised its rights to require immediate payment in full of the sums secured by this Security instrument and Borrower has not abandoned the Property.

34. **Riders to this Security Instrument.** If one or more riders are executed by Borrower and recorded together with this Security Instrument, the covenants and agreements of each such rider shall be incorporated into and shall amend and supplement the covenants and agreements of this Security Instrument as if the rider(s) were a part of this Security Instrument. [Check applicable box(es)]

☐ Adjustable Rate Rider      ☐ Condominium Rider      ☐ 1-4 Family Rider
☐ No Prepayment Penalty Option Rider      ☐ Planned Unit Development Rider      ☐ Occupancy Rider
☒ Acknowledgement and Waiver of Borrower's Rights
☐ Other(s) (specify)

BORROWER ACCEPTS AND AGREES to the terms and covenants contained in this Security Instrument and in any rider(s) executed by Borrower and recorded with it. IN WITNESS WHEREOF, Borrower has signed and sealed this Security Instrument.

Signed, sealed and delivered in the presence of:

_____ (Seal)
PEDRO   BURGOS              -Borrower

Unofficial Witness

_____ (Seal)
O.  WAYNE  SPENCE               -Borrower

Notary Public,          MUSCOGEE     County

_____ (Seal)
                             -Borrower

O. WAYNE SPENCE
NOTARY PUBLIC • OFFICIAL SEAL
MUSCOGEE COUNTY, GEORGIA
My Commission Expires 10/12/03

_____ (Seal)
                             -Borrower

_____ (Seal)
                             -Borrower

_____ (Seal)
                             -Borrower

GAD10016 (07-29-98)

PLEASE RETURN TO:

**PEDRO BURGOS**
4519 Woodruff Road, Suite 4 #318
Columbus, Georgia 30127

CFN: 20130002329   B: 10818 P: 323   DEED
01/28/2013 03:58:42 PM  Pages: 2
M. Linda Pierce Clerk of Superior,State&Juvenile Courts
Muscogee County County, GA
GA INT TRANS TAX: $

| | |
|---|---|
| **STATE OF GEORGIA** | ) |
| | ) SS. |
| **COUNTY OF MUSCOGEE** | ) |

RE: Deed Book 6630 Page 148

<u>**AFFIDAVIT OF LAURA (HERRON) IRVIN AFFECTING TITLE
TO LAND CONCERNING A SECURITY DEED**</u>

**PERSONALLY APPEARED** before me, the undersigned attesting officer duly

authorized by law to administer oaths is **LAURA (HERRON) IRVIN** after being

duly sworn deposes and states under oath the following:

1. My name is **LAURA (HERRON) IRVIN** in the above-styled matter and

that I am over the age of the majority and suffer from no legal disability.

2. I am giving this affidavit as it relates to the Security Deed filed with the

Clerk of Superior Court of Muscogee County recorded in Deed Book 6630 Page 148

given by Pedro Burgos on December 20, 2002 to Option One Mortgage Corporation.

3. From January 17th, 2000 to June 31st, 2004, I was employed with the law

firm of: O. Wayne Spence at 2945 Gardenia Street, Columbus, Georgia 31906.

4.  Part of my job with the law firm was to help process and finalized real

estate closing documents.  It was my job as a reception to the law firm, to witness

real estate documents such as Deeds, Security Deeds, Closing Affidavit and other

related documents to real estate loan transactions.

5. I was a Legal Secretary with the law firm of O. Wayne Spence.  As a Legal

Secretary, I was never in the room with the clients during closing and I never saw

or attested any document by the clients until after closing of a loan.

Affidavit at Page 1

PLEASE RETURN TO:

PEDRO BURGOS
4519 Woodruff Road, Suite 4 #318
Columbus, Georgia 30127

_____

6. Closing documents were routinely given to me for processing for my signature as a witness after clients has already left the closing attorney's office.

7. On December 20th, 2002, I never witnessed during closing, attested or saw Mr. Pedro Burgos actually signed the Security Deed filed with this Court recorded in Deed Book 6630 Page 148. I later placed my signature on the Security Deed after the loan documents were given to me for my signature as a witness for Mr. Burgos after the closing process was completed by the closing attorney.

8. Furthermore, I never saw or spoke with Mr. Pedro Burgos when he signed the Security Deed dated December 20th, 2002 at the time of closing.

9. I have reviewed the Security Deed dated December 20th, 2002 recorded in Book 6630 Page 148 signed by Pedro Burgos given to Option One Mortgage Corporation and verify that I am the witness who signed the Security Deed.

10. I make this affidavit pursuant to O.C.G.A. § 44-2-20(a) based upon my personal knowledge, information and belief of the facts stated herein.

**FURTHER AFFIANT SAY NOT.**

This _28th_ day of _January_, 2013.

Respectfully Submitted,

_____
Laura (Herron) Irvin, Affiant

Sworn to and Subscribed before Me,
This _28th_ day of _JAN_, 2013.

_____
STATE NOTARY PUBLIC OFFICER

Affidavit at Page 2



*Exhibit "B"*

CFN: 20110035264  B: 10430 P: 231   DEED
11/28/2011 03:30:31 PM  Pages: 1
A. Linda Pierce Clerk of Superior,State&Juvenile Courts
Muscogee County County, GA

GA INT TRANS TAX  $

When Recorded Return To:
American Home Mortgage
C/O NTC 2100 Alt. 19 North
Palm Harbor, FL 34683

AHMSI L#: 0010290716
Investor: OTHER
Investor L#: 51044763

## ASSIGNMENT OF MORTGAGE/DEED

--- Contact American Home Mortgage Servicing, Inc., 1525 S. Beltline Rd., Coppell, TX 75019, telephone # (469) 645-3000, which is responsible for receiving payments.
FOR GOOD AND VALUABLE CONSIDERATION, the sufficiency of which is hereby acknowledged, the undersigned, Sand Canyon Corporation f/k/a Option One Mortgage Corporation, WHOSE ADDRESS IS 7595 Irvine Center Dr #100, Irvine, CA, 92618, (ASSIGNOR), by these presents does convey, grant, sell, assign, transfer and set over the described Mortgage/Deed together with all interest secured thereby, all liens, and any rights due or to become due thereon to WELLS FARGO BANK, N.A., AS TRUSTEE FOR OPTION ONE MORTGAGE LOAN TRUST 2003-1, ASSET-BACKED CERTIFICATES, SERIES 2003-1, WHOSE ADDRESS IS 9062 OLD ANNAPOLIS ROAD, COLUMBIA, MD 21045-1951, ITS SUCCESSORS OR ASSIGNS, (ASSIGNEE).

Said Mortgage/Deed is executed by PEDRO BURGOS to OPTION ONE MORTGAGE CORPORATION and recorded in Deed Book 6630 page 148 and/or as Instr. Number  in the office of the Clerk of the Superior Court of MUSCOGEE County, Georgia.

In witness whereof, the undersigned has set his hand has hereunto set their hands on 11/ 17 /2011 (MM/DD/YYYY).

Sand Canyon Corporation f/k/a Option One Mortgage Corporation
By: _____
   VILMA CASTRO   VICE PRESIDENT

And: _____
   ELSA MCKINNON   ASST. SECRETARY

Signed and delivered on the date above shown.

_____
ASHLEY BRABAND   Witness

_____
DEBRA GOYER   Witness

STATE OF FLORIDA   COUNTY OF PINELLAS
The foregoing instrument was acknowledged before me on 11/ 17 /2011 (MM/DD/YYYY), by VILMA CASTRO and ELSA MCKINNON as VICE PRESIDENT and ASST. SECRETARY, respectively for Sand Canyon Corporation f/k/a Option One Mortgage Corporation, who, as such VICE PRESIDENT and ASST. SECRETARY, respectively being authorized to do so, executed the foregoing instrument for the purposes therein contained. He/she/they is (are) personally known to me.

_____
MIRANDA AVILA
Notary Public - State of FLORIDA
Commission expires: 08/22/2014

Miranda Avila
Notary Public State of Florida
My Commission # EE 019063
Expires August 22, 2014

Document Prepared By: Erika Lance/NTC, 2100 Alt. 19 North, Palm Harbor, FL 34683 (800)346-9152

AMSAS 15246853 - @ CJ3375966 FORMS\FRMGAM1

*15246853*

# EXHIBIT

# "C"

*Exhibit "C"*

**Pedro Burgos**
4519 Woodruff Road
Suite 4  #318
Columbus, Georgia  31904

VIA-FAX AND CERTIFIED MAIL   7008  2810  0002  3711  9753

February 25th, 2013

Attn: Evan Staley
PENDERGAST & ASSOCIATES, P.C.
Tenant Occupied Properties Department
115 Perimeter Center Place
South Terraces, Suite 1000
Atlanta, Georgia  30101

Reference:   Tenant Samuel C. Copeland and ALL OTHERS
            7440 McKee Road, Upatoi, Georgia 31829

Dear Evan Staley:

This letter is to notify you that I have a lease agreement with Mr. Samuel C. Copeland and ALL Others tenants located at: 7440 McKee Road, Upatoi, Georgia 31829.  The property is under a lease with Mr. Copeland according to Georgia law and is subject to 12 U.S.C. § 5201 of Title VII § 702(a) of the "Protecting Tenants at Foreclosure Act of 2009".

Per your request, we have enclosed and have also attached to this letter the following documents that your office has requested according to your letter dated February, 14th, 2013 as follows:

1. Copy of the Residential Property Lease Agreement; and
2. Copy of Rental Payments to current date.

I inform you that Mr. Copeland is not the owner of said property nor is he in any way related to the owner of the property in this respect as it relates to the above-stated provisions of Federal law.  See, *Harper v. JP Morgan Chase Bank Nat'l Ass'n*, 305 Ga. App. 536, 699 S.E.2d 854, 856 (2010) (PTFA applies where mortgage loan is being foreclosed upon and the tenant is a bona fide tenant under a bona fide lease).

I further inform you that based upon my own investigation, the foreclosure sale of the leased property was wrongful and illegal and the so-called Deed Under Power is also null and void.  Upon completion of my final investigation, your office will be notified of my legal claims.  I am asking that you cease and desist from taking any steps in enforcing said deed and by violating my rights in this matter.

PLEASE GOVERN YOURSELF ACCORDINGLY.

Respectfully yours,

*Pedro Burgos*

Pedro Burgos
Owner/Lessor

STATE OF GEORGIA    )
                        ) SS.
COUNTY OF MUSCOGEE )

## RESIDENTIAL PROPERTY LEASE AGREEMENT

Date: **September 28, 2012**

    Agreement between **PEDRO BURGOS** (Owner), and *Samuel Copeland* (Tenant), for a dwelling located at: **7440 MCKEE ROAD, UPATOI, GEORGIA 31829**.

    1. Tenant agrees to lease one bedroom of this dwelling, with common living areas shared by the Owner, for a term of: __12__ months, beginning: **October 1, 2012** and ending on **September 30, 2013** for the sum of: $ *1200* ____ per month, payable in advance on the **1st** day of each calendar month to the Owner, payable to: "**PEDRO BURGOS.**" whose address is: **7440 MCKEE ROAD, UPATOI, GEORGIA 31829**.   A late fee of **$50.00** will be assessed if the payment is not received by the **5TH** day of each month; on the **15TH** day of each month, the late fee will increase to **$100.00**.   The security/cleaning deposit for this dwelling place shall be: **$500.00** made payable to the Owner by the Tenant prior to move in.

    2. The security deposit is refundable if the Tenant leaves the dwelling reasonably clean and undamaged.  The security deposit will earn interest during the term of the lease.  Tenant may not use the security deposit as payment of the last month's rent.

    3. Owner will refund all deposits due within 30 days after Tenant has moved out completely and returned the keys, provided no rent, fees or other costs are due to the Owner. Should it be necessary to retain part or all of the security deposit due to damage, cleaning/trash removal, or unpaid fees, an itemized statement will be provided to the Tenant.

    4. Should the Tenant move before this Agreement expires, the Tenant will be responsible for paying rent through the end of the lease term or until another tenant approved by the Owner has moved in, whichever comes first. All costs associated with searching for a new tenant will be the responsibility of the Tenant.

    5. Without the Owner's prior written permission, no persons other than those with a signed leased may live in the house.  No pets may stay there, even temporarily, nor may any room of the dwelling be used for business purposes.   Overnight and weekend guests are permitted, with a maximum of two per tenant, with the agreement of all the other current residents. Sublets are subject to prior written approval of the Owner.

    6. Tenant agrees to maintain the rental unit in a clean and sanitary condition.  Tenant also agrees to help keep the common living areas, yards, and garbage areas of the house clean, with chores assigned according to an agreement made mutually by all the current residents of the house.  Tenant agrees to provide their own insurance and to name Owner as additional insured under Tenant's insurance policy.

Lease Agreement Page 1.

7. Tenant agrees to file claims for any property or personal loss through their own insurance company before filing any claims against the Owner insurance policy. Tenant agrees to hold the Owner harmless from claims for personal or property loss for which the Owner is not responsible and which the Tenant's own insurance should cover.

**OWNER AGREES TO THE FOLLOWING:**

(1).    Owner may provide the following furniture:  sofas, chairs, and tables for the living room and dining room.  A bed, dresser, desk and chair for each bedroom and may provide any window treatment for the rented designated bedroom.

(2).    Owner shall provide the following kitchen appliances:  a refrigerator, one freezer, one microwave, and one stove.

(3).    Owner shall provide laundry facilities free of charge for the use of Tenant only.

(4).    Owner shall pay all utilities, including electric, gas, water and cable TV.

(5).    Owner shall pay for garbage collection.

(6).    Owner shall lease said property at fair market value or reduce subsidized value.

**TENANT AGREES TO THE FOLLOWING:**

(1)    Tenant shall accept the dwelling "as is," having already inspected it.

(2)    Tenant shall keep from making loud noises or disturbances and to play music or broadcast programs so as not to disturb other people's peace and quiet at any time.

(3).    Tenant shall keep all gatherings of residents and their guests from becoming disorderly.  The maximum number of guests allowed at any one time in the house will be 10. Tenant must notify Owner, and receive permission, for any party including more than two guests.

(4)    Tenant shall pay for repairs of all damage they, or their guests, have caused, including broken windows.

(5)    Tenant shall not to paint, or otherwise physically alter, any part of the dwelling without first getting Owner's written permission.

(6)    Tenant shall not to drill any holes or to apply any adhesives, paint, or other substances to the woodwork anywhere in the house (i.e.: doors, window trim, door trim).  Posters and pictures may be hung on the plaster walls, using plain adhesive tape, thumbtacks, pins, or small nails. Products such as "poster putty" or other adhesives are not to be used.

(7).    Tenant shall not to remove or to add any furniture or window treatments to the common living areas of the house without first getting Owner's written permission.

(8).    Tenant shall use a watertight pan underneath any mini-refrigerator used in Tenant's room.

(9).    Tenant shall not to keep any liquid-filled furniture in this dwelling.

(10).    Tenant shall pay rent by cash, check, money order or any labor or services equal to the value of the rent paid to Home Owner of this lease agreement and all: (returned checks will have applicable late payment fees, as well as any bank charges imposed on the Owner).

(11).    Tenant shall allow Owner to inspect the dwelling, or to show it to prospective tenants at any and all reasonable times, upon 72 hours notice except in cases of emergency.

8. Violation of any part of this Agreement or nonpayment of rent when due shall be cause for eviction. The prevailing party to any claims arising under this lease shall recover reasonable legal service fees involved.

9. The parties agree that the law that governs this Lease Agreement is the law of the State of Georgia and that this agreement is made pursuant to 12 U.S.C. § 5201 of Title VII Sec. 702(a) the "Protecting Tenants at Foreclosure Act of 2009".

10. The Owner is not liable for any loss or damage of Tenant's personal property while it is on the premises.

11. Owner and the Tenant hereby acknowledge that they have read this Agreement, understand it, agree to it, and have been given a copy of the same.

Owner: _____  Tenant: _____
        **Pedro Burgos**                 Print Name: Samuel C. Copeland

Date: ____9/28/12____              Date: ____Sept 28, 2012____


Prepared by:  **JOHNSON, JONES, WATKINS & COOPER, LLC.**
              **Attorneys & Counselors at Law**
              **340 West Peachtree Street, N.E. Suite 200**
              **Atlanta, Georgia 30308**
              **(404) 688-7100**

Lease Agreement Page 3.

# EXHIBIT

# "D"

*Exhibit "D"*

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF LOUISIANA
NEW ORLEANS

| | | |
|---|---|---|
| In re | : | Chapter 13 |
| | : | |
| RON WILSON, SR. & | : | Case No. 07-11862 (EWM) |
| LaRHONDA WILSON, | : | |
| | : | |
| Debtors. | : | |

## DECLARATION OF DALE M. SUGIMOTO,
## AS PRESIDENT OF SAND CANYON CORPORATION

I, Dale M. Sugimoto declare as follows:

1.     I am the President of Sand Canyon Corporation ("Sand Canyon")
f/k/a Option One Mortgage Corporation ("OOMC").  H&R Block Inc. ("HRB") is the ultimate
parent company of Sand Canyon.  Sand Canyon is wholly-owned by OOMC Holdings LLC,
which is wholly-owned by Block Financial LLC, which is wholly-owned by H&R Block Group,
Inc., which is wholly-owned by HRB, a publicly traded corporation.

2.     Effective as of April 30, 2008, HRB sold OOMC's mortgage loan
servicing business to American Home Mortgage Servicing, Inc. ("AHMS"), an affiliate of WL
Ross & Co. LLC.   Pursuant to the sale agreement, OOMC changed its name to "Sandy Canyon
Corporation."

3.     In a May 1, 2008 press release, Richard C. Breeden, the chair of HRB's
board of directors, stated that "[t]he closing of the Option One sale is a significant milestone in
the transformation and refocusing of H&R Block" whereby HRB "delivered on the promise we
made to shareholders to change the future course of our company" to do "what we do best, which
is serving the tax preparation needs of tens of millions of clients."  The May 1, 2008 press
release is available on the internet at http://www.hrblock.com/press/Article.jsp?articleid=1531.

4.      In addition, in its 2008 Annual Report, HRB stated as follows:

DISCONTINUED OPERATIONS - Effective November 2006, our Board
of Directors approved a plan to exit the mortgage business operated
through our subsidiary, OOMC, and we began reporting that business as
discontinued operations.  During our third fiscal quarter ended January 31,
2008, OOMC ceased all loan origination activities, and initiated a plan to
sell its servicing operations.

On April 30, 2008, OOMC sold its loan servicing assets to an affiliate of
WL Ross & Co. LLC (WL Ross) pursuant to a previously announced
agreement.

5.      Accordingly, Sand Canyon is no longer engaged in the servicing of
residential mortgage loans.  Sand Canyon has no servicing rights.

6.      Sand Canyon also does not own any residential real estate mortgages.

7.      Sand Canyon's present business involves dealing with litigation claims,
including title issues or litigation relating to servicing prior to the sale of OOMC's servicing
rights to AHMS.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on:  March 18, 2009

By:  _____
        Dale M. Sugimoto
        President of Sand Canyon Corporation

# EXHIBIT

# "E"

Exhibit "E"

```
<DOCUMENT>
<TYPE>EX-4.1
<SEQUENCE>3
<FILENAME>d116541.txt
<DESCRIPTION>INSTRUMENTS DEFINING RIGHTS OF SECURITY HOLDERS
<TEXT>
```

===============================================================================

OPTION ONE MORTGAGE ACCEPTANCE CORPORATION,
Depositor


OPTION ONE MORTGAGE CORPORATION,
Master Servicer


and


WELLS FARGO BANK MINNESOTA, NATIONAL ASSOCIATION,
Trustee


POOLING AND SERVICING AGREEMENT

Dated as of January 1, 2003


--------------------------------------------


Option One Mortgage Loan Trust 2003-1

Asset-Backed Certificates, Series 2003-1


===============================================================================

```
<PAGE>


<TABLE>
<CAPTION>
```

TABLE OF CONTENTS

ARTICLE I

DEFINITIONS

| `<S>` | `<C>` |
|---|---|
| SECTION 1.01. | Defined Terms........................................................ |
| SECTION 1.02. | Accounting........................................................... |
| SECTION 1.03. | Allocation of Certain Interest Shortfalls........................... |
| SECTION 1.04. | Rights of the NIMS Insurer.......................................... |

ARTICLE II

CONVEYANCE OF MORTGAGE LOANS;
ORIGINAL ISSUANCE OF CERTIFICATES

| SECTION 2.01. | Conveyance of Mortgage Loans........................................ |
| SECTION 2.02. | Acceptance by Trustee............................................... |
| SECTION 2.03. | Repurchase or Substitution of Mortgage Loans by the Originator...... |
| SECTION 2.04. | Intentionally Omitted............................................... |
| SECTION 2.05. | Representations, Warranties and Covenants of the Master Servicer.... |
| SECTION 2.06. | Representations and Warranties of the Depositor..................... |
| SECTION 2.07. | Issuance of Certificates............................................ |
| SECTION 2.08. | Conveyance of the Subsequent Mortgage Loans......................... |
| SECTION 2.09. | Conveyance of  REMIC Regular Interests and Acceptance of REMIC 2 and REMIC 3 by the Trustee; Issuance of Certificates................ |
| SECTION 2.10. | Negative Covenants of the Trustee and the Master Servicer........... |

ARTICLE III

ADMINISTRATION AND SERVICING
OF THE MORTGAGE LOANS

SECTION 3.01.   Master Servicer to Act as Master Servicer.................................................
SECTION 3.02.   Sub-Servicing Agreements Between Master Servicer and
                   Sub-Servicers..............................................................
SECTION 3.03.   Successor Sub-Servicers.......................................................
SECTION 3.04.   Liability of the Master Servicer..............................................
SECTION 3.05.   No Contractual Relationship Between Sub-Servicers and the NIMS
                   Insurer, the Trustee or Certificateholders..................................
SECTION 3.06.   Assumption or Termination of Sub-Servicing Agreements by Trustee..............
SECTION 3.07.   Collection of Certain Mortgage Loan Payments..................................
SECTION 3.08.   Sub-Servicing Accounts........................................................
SECTION 3.09.   Collection of Taxes, Assessments and Similar Items; Servicing
                   Accounts...................................................................
SECTION 3.10.   Collection Account, Initial Deposit Account and Distribution

i

<PAGE>

                   Account....................................................................
SECTION 3.11.   Withdrawals from the Collection Account and Distribution Account..............
SECTION 3.12.   Investment of Funds in the Interest Coverage Account, Collection
                   Account, Initial Deposit Account and the Distribution Account...............
SECTION 3.13.   [Reserved]....................................................................
SECTION 3.14.   Maintenance of Hazard Insurance and Errors and Omissions and
                   Fidelity Coverage..........................................................
SECTION 3.15.   Enforcement of Due-On-Sale Clauses; Assumption Agreements.....................
SECTION 3.16.   Realization Upon Defaulted Mortgage Loans.....................................
SECTION 3.17.   Trustee to Cooperate; Release of Mortgage Files...............................
SECTION 3.18.   Servicing Compensation........................................................
SECTION 3.19.   Reports to the Trustee; Collection Account Statements.........................
SECTION 3.20.   Statement as to Compliance....................................................
SECTION 3.21.   Independent Public Accountants' Servicing Report..............................
SECTION 3.22.   Access to Certain Documentation; Filing of Reports by Trustee.................
SECTION 3.23.   Title, Management and Disposition of REO Property.............................
SECTION 3.24.   Obligations of the Master Servicer in Respect of Prepayment
                   Interest Shortfalls........................................................
SECTION 3.25.   [Reserved]....................................................................
SECTION 3.26.   Obligations of the Master Servicer in Respect of Mortgage Rates
                   and Monthly Payments.......................................................
SECTION 3.27.   Solicitations.................................................................
SECTION 3.28.   Reserve Fund..................................................................
SECTION 3.29.   Advance Facility..............................................................
SECTION 3.30.   PMI Policy; Claims Under the PMI Policy........................................

ARTICLE IV

FLOW OF FUNDS

SECTION 4.01.   Distributions.................................................................
SECTION 4.02.   [Reserved]....................................................................
SECTION 4.03.   Statements....................................................................
SECTION 4.04.   Remittance Reports; Advances..................................................
SECTION 4.05.   Pre-Funding Account...........................................................
SECTION 4.06.   Interest Coverage Account.....................................................
SECTION 4.07.   Distributions on the REMIC Regular Interests...................................
SECTION 4.08.   Allocation of Realized Losses.................................................

ii

<PAGE>

ARTICLE V

THE CERTIFICATES

SECTION 5.01.   The Certificates..............................................................
SECTION 5.02.   Registration of Transfer and Exchange of Certificates.........................
SECTION 5.03.   Mutilated, Destroyed, Lost or Stolen Certificates.............................
SECTION 5.04.   Persons Deemed Owners.........................................................
SECTION 5.05.   Appointment of Paying Agent...................................................

ARTICLE VI

THE MASTER SERVICER AND THE DEPOSITOR

SECTION 6.01.   Liability of the Master Servicer and the Depositor.....................
SECTION 6.02.   Merger or Consolidation of, or Assumption of the Obligations of, the
                Master Servicer or the Depositor.......................................
SECTION 6.03.   Limitation on Liability of the Master Servicer and Others..............
SECTION 6.04.   Master Servicer Not to Resign..........................................
SECTION 6.05.   Delegation of Duties...................................................
SECTION 6.06.   [Reserved].............................................................
SECTION 6.07.   Inspection.............................................................

                            ARTICLE VII

                              DEFAULT

SECTION 7.01.   Master Servicer Events of Termination..................................
SECTION 7.02.   Trustee to Act; Appointment of Successor...............................
SECTION 7.03.   Waiver of Defaults.....................................................
SECTION 7.04.   Notification to Certificateholders.....................................
SECTION 7.05.   Survivability of Master Servicer Liabilities...........................

                            ARTICLE VIII

                            THE TRUSTEE

SECTION 8.01.   Duties of Trustee......................................................
SECTION 8.02.   Certain Matters Affecting the Trustee..................................
SECTION 8.03.   Trustee Not Liable for Certificates or Mortgage Loans..................
SECTION 8.04.   Trustee May Own Certificates...........................................
SECTION 8.05.   Trustee Fee and Expenses...............................................
SECTION 8.06.   Eligibility Requirements for Trustee...................................
SECTION 8.07.   Resignation or Removal of Trustee......................................
SECTION 8.08.   Successor Trustee......................................................
SECTION 8.09.   Merger or Consolidation of Trustee.....................................

                                 iii

<PAGE>

SECTION 8.10.   Appointment of Co-Trustee or Separate Trustee..........................
SECTION 8.11.   Limitation of Liability................................................
SECTION 8.12.   Trustee May Enforce Claims Without Possession of Certificates..........
SECTION 8.13.   Suits for Enforcement..................................................
SECTION 8.14.   Waiver of Bond Requirement.............................................
SECTION 8.15.   Waiver of Inventory, Accounting and Appraisal Requirement..............

                            ARTICLE IX

                        REMIC ADMINISTRATION

SECTION 9.01.   REMIC Administration...................................................
SECTION 9.02.   Prohibited Transactions and Activities.................................
SECTION 9.03.   Indemnification with Respect to Certain Taxes and Loss of REMIC
                Status.................................................................

                             ARTICLE X

                            TERMINATION

SECTION 10.01.  Termination............................................................
SECTION 10.02.  Additional Termination Requirements....................................

                            ARTICLE XI

                      MISCELLANEOUS PROVISIONS

SECTION 11.01.  Amendment..............................................................
SECTION 11.02.  Recordation of Agreement; Counterparts.................................
SECTION 11.03.  Limitation on Rights of Certificateholders.............................
SECTION 11.04.  Governing Law; Jurisdiction............................................
SECTION 11.05.  Notices................................................................
SECTION 11.06.  Severability of Provisions.............................................
SECTION 11.07.  Article and Section References.........................................
SECTION 11.08.  Notice to the Rating Agencies and the NIMS Insurer.....................
SECTION 11.09.  Further Assurances.....................................................
SECTION 11.10.  Third Party Rights.....................................................
SECTION 11.11.  Benefits of Agreement..................................................
SECTION 11.12.  Acts of Certificateholders.............................................
SECTION 11.13   No Petition............................................................

```
</TABLE>

                                                 iv

<PAGE>


<TABLE>
<CAPTION>

EXHIBITS:


<S>                      <C>
Exhibit A-1              Form of Class A-1 Certificates
Exhibit A-2              Form of Class A-2 Certificates
Exhibit A-3              Form of Class M-1 Certificates
Exhibit A-4              Form of Class M-2 Certificates
Exhibit A-5              Form of Class M-3 Certificates
Exhibit A-6              Form of Class M-4 Certificates
Exhibit A-7              Form of Class C Certificates
Exhibit A-8              Form of Class P Certificates
Exhibit A-9              Form of Class R Certificates
Exhibit B                [Reserved]
Exhibit C                Form of Mortgage Loan Purchase Agreement
Exhibit D                Mortgage Loan Schedule
Exhibit E                Request for Release
Exhibit F-1              Form of Trustee's Initial Certification
Exhibit F-2              Form of Trustee's Final Certification
Exhibit F-3              Form of Receipt of Mortgage Note
Exhibit G                Loss Mitigation Procedures
Exhibit H                Form of Lost Note Affidavit
Exhibit I                [Reserved]
Exhibit J                Form of Investment Letter
Exhibit K                Form of Class R Certificate Transfer Affidavit
Exhibit L                Form of Transferor Certificate
Exhibit M                Form of ERISA Representation Letter
Exhibit N                Form of Cap Contracts
Exhibit O                Form of Subsequent Transfer Instrument
Exhibit P                Form of Addition Notice
Exhibit R-1              Form of Certification to Be Provided by the Depositor with Form 10-K
Exhibit R-2              Form of Certification to Be Provided to Depositor by the Trustee


Schedule I               Prepayment Charge Schedule
Schedule II              PMI Mortgage Loans

</TABLE>

                                                 v


<PAGE>


           This Pooling and Servicing Agreement is dated as of January 1,
2003 (the "Agreement"), among OPTION ONE MORTGAGE ACCEPTANCE CORPORATION, as
depositor (the "Depositor"), OPTION ONE MORTGAGE CORPORATION, as master servicer
(the "Master Servicer") and WELLS FARGO BANK MINNESOTA, NATIONAL ASSOCIATION, as
trustee (the "Trustee").

                        PRELIMINARY STATEMENT:

           The Depositor intends to sell pass-through certificates
(collectively, the "Certificates"), to be issued hereunder in multiple classes,
which in the aggregate will evidence the entire beneficial ownership interest in
the Trust Fund created hereunder. The Certificates will consist of nine classes
of certificates, designated as (i) the Class A-1 Certificates, (ii) the Class
A-2 Certificatees, (iii) the Class M-1 Certificates, (iv) the Class M-2
Certificates, (v) the Class M-3 Certificates, (vi) the Class M-4 Certificates,
(vii) the Class P Certificates, (viii) the Class C Certificates and (ix) the
Class R Certificates.

                              REMIC 1

           As provided herein, the Trustee will make an election to treat the
segregated pool of assets consisting of the Group I Mortgage Loans, the Group II
Mortgage Loans and certain other related assets subject to this Agreement (but
exclusive of the Pre-Funding Accounts, the Interest Coverage Accounts, the
Initial Deposit Accounts, the Net WAC Rate Carryover Reserve Account, the Excess
```

stating that the original mortgage note was lost, misplaced or destroyed, together with a copy of the related mortgage note; provided, however, that such substitutions for Lost Note Affidavits for original Mortgage Notes may occur only with respect to Mortgage Loans, the aggregate Cut-off Date Principal Balance or Subsequent Cut-off Date Principal Balance, as applicable, of which is less than or equal to 1.00% of the Pool Balance as of the Cut-off Date or Subsequent Cut-off Date, as applicable;

(ii) the original Mortgage with evidence of recording thereon, and the original recorded power of attorney, if the Mortgage was executed pursuant to a power of attorney, with evidence of recording thereon or, if such Mortgage or power of attorney has been submitted for recording but has not been returned from the applicable public recording office, has been lost or is not otherwise available, a copy of such Mortgage or power of attorney, as the case may be, certified to be a true and complete copy of the original submitted for recording;

53

<PAGE>

(iii) an original Assignment, in form and substance acceptable for recording. The Mortgage shall be assigned either (A) in blank or (B) to "Wells Fargo Bank Minnesota, National Association, as Trustee, without recourse";

(iv) an original copy of any intervening assignment of Mortgage showing a complete chain of assignments;

(v) the original or a certified copy of lender's title insurance policy; and

(vi) the original or copies of each assumption, modification, written assurance or substitution agreement, if any.

The Trustee agrees to execute and deliver (or cause the Custodian to execute and deliver) to the Depositor and the NIMS Insurer on or prior to the Closing Date an acknowledgment of receipt of the original Mortgage Note (with any exceptions noted), substantially in the form attached as Exhibit F-3 hereto.

If any of the documents referred to in Section 2.01(ii), (iii) or (iv) above has as of the Closing Date (or Subsequent Transfer Date, with respect to Subsequent Mortgage Loans) been submitted for recording but either (x) has not been returned from the applicable public recording office or (y) has been lost or such public recording office has retained the original of such document, the obligations of the Depositor to deliver such documents shall be deemed to be satisfied upon (1) delivery to the Trustee or the Custodian no later than the Closing Date (or Subsequent Closing Date, with respect to Subsequent Mortgage Loans), of a copy of each such document certified by the Master Servicer, in its capacity as Originator, in the case of (x) above or the applicable public recording office in the case of (y) above to be a true and complete copy of the original that was submitted for recording and (2) if such copy is certified by the Master Servicer, in its capacity as Originator, delivery to the Trustee or the Custodian, promptly upon receipt thereof of either the original or a copy of such document certified by the applicable public recording office to be a true and complete copy of the original. If the original lender's title insurance policy, or a certified copy thereof, was not delivered pursuant to Section 2.01(v) above, the Master Servicer, in its capacity as Originator, shall deliver or cause to be delivered to the Trustee or the Custodian, the original or a copy of a written commitment or interim binder or preliminary report of title issued by the title insurance or escrow company or an original attorney's opinion of title, with the original or a certified copy thereof to be delivered to the Trustee or the Custodian, promptly upon receipt thereof. The Master Servicer or the Depositor shall deliver or cause to be delivered to the Trustee or the Custodian promptly upon receipt thereof any other documents constituting a part of a Mortgage File received with respect to any Mortgage Loan, including, but not limited to, any original documents evidencing an assumption or modification of any Mortgage Loan.

Upon discovery or receipt of notice of any materially defective document in, or that a document is missing from, a Mortgage File, the Master Servicer, in its capacity as Originator, shall have 120 days to cure such defect or deliver such missing document to the Trustee or the Custodian. If the Originator does not cure such defect or deliver such missing document within such time period, the Master Servicer, in its capacity as Originator, shall either repurchase or substitute for such Mortgage Loan in accordance with

Section 2.03.

<PAGE>

          The Depositor (at the expense of the Master Servicer, in its
capacity as Originator) shall cause the Assignments which were delivered in
blank to be completed and shall cause all Assignments referred to in Section
2.01(iii) hereof and, to the extent necessary, in Section 2.01(iv) hereof to be
recorded. The Depositor shall be required to deliver such Assignments for
recording within 90 days of the Closing Date (or Subsequent Transfer Date, with
respect to a Subsequent Mortgage Loan). Notwithstanding the foregoing, however,
for administrative convenience and facilitation of servicing and to reduce
closing costs, the Assignments of Mortgage shall not be required to be submitted
for recording (except with respect to any Mortgage Loan located in Maryland)
unless the Trustee and the Depositor receives notice that such failure to record
would result in a withdrawal or a downgrading by any Rating Agency of the rating
on any Class of Certificates; provided, however, each Assignment shall be
submitted for recording by the Depositor in the manner described above, at no
expense to the Trust Fund or Trustee, upon the earliest to occur of: (i)
reasonable direction by Holders of Certificates entitled to at least 25% of the
Voting Rights, (ii) the occurrence of a Master Servicer Event of Termination,
(iii) the occurrence of a bankruptcy, insolvency or foreclosure relating to the
Master Servicer, (iv) the occurrence of a servicing transfer as described in
Section 7.02 hereof, (v) if the Originator is not the Master Servicer and with
respect to any one Assignment the occurrence of a bankruptcy, insolvency or
foreclosure relating to the Mortgagor under the related Mortgage, (vi) any
Mortgage Loan that is 90 days or more Delinquent and (vii) reasonable direction
by the NIMS Insurer. Upon (a) receipt of written notice from the Trustee that
recording of the Assignments is required pursuant to one or more of the
conditions (excluding (v) and (vi) above) set forth in the preceding sentence or
(b) upon the occurrence of condition (v) or (vi) in the preceding sentence, the
Depositor shall be required to deliver such Assignments for recording as
provided above, promptly and in any event within 30 days following receipt of
such notice. Notwithstanding the foregoing, if the Originator fails to pay the
cost of recording the Assignments, such expense will be paid by the Trustee and
the Trustee shall be reimbursed for such expenses by the Trust. The Depositor
shall furnish the Trustee, or its designated agent, with a copy of each
Assignment submitted for recording. In the event that any such Assignment is
lost or returned unrecorded because of a defect therein, the Depositor shall
promptly have a substitute Assignment prepared or have such defect cured, as the
case may be, and thereafter cause each such Assignment to be duly recorded. In
the event that any Mortgage Note is endorsed in blank as of the Closing Date (or
Subsequent Transfer Date, with respect to Subsequent Mortgage Loans), within
ninety (90) days of the Closing Date (or Subsequent Transfer Date, with respect
to Subsequent Mortgage Loans) the Depositor shall cause to be completed such
endorsements "Pay to the order of Wells Fargo Bank Minnesota, National
Association, as Trustee, without recourse."

          The Depositor herewith delivers to the Trustee an executed
copy of the Mortgage Loan Purchase Agreement and the PMI Policy.

          The Master Servicer shall forward to the Custodian original
documents evidencing an assumption, modification, consolidation or extension of
any Mortgage Loan entered into in accordance with this Agreement within two
weeks of their execution; provided, however, that the Master Servicer shall
provide the Custodian with a certified true copy of any such document submitted
for recordation within two weeks of its execution, and shall provide the
original of any document submitted for recordation or a copy of such document
certified by the appropriate public recording office to be a true and complete
copy of the original within 365 days of its submission for recordation. In the
event that the Master Servicer cannot provide a copy of such document certified

<PAGE>

by the public recording office within such 365 day period, an Officers'
Certificate of the Master Servicer which shall (A) identify the recorded
document, (B) state that the recorded document has not been delivered to the
Custodian due solely to a delay caused by the public recording office, (C) state
the amount of time generally required by the applicable recording office to
record and return a document submitted for recordation, if known and (D) specify
the date the applicable recorded document is expected to be delivered to the

Custodian, and, upon receipt of a copy of such document certified by the public recording office, the Master Servicer shall immediately deliver such document to the Custodian. In the event the appropriate public recording office will not certify as to the accuracy of such document, the Master Servicer shall deliver a copy of such document certified by an officer of the Master Servicer to be a true and complete copy of the original to the Custodian.

SECTION 2.02. Acceptance by Trustee.

Subject to the provisions of Section 2.01 and subject to the review described below and any exceptions noted on the exception report described in the next paragraph below, the Trustee acknowledges receipt of the documents referred to in Section 2.01 above and all other assets included in the definition of "Trust Fund" and declares that it holds and will hold such documents and the other documents delivered to it constituting a Mortgage File, and that it holds or will hold all such assets and such other assets included in the definition of "Trust Fund" in trust for the exclusive use and benefit of all present and future Certificateholders.

The Trustee agrees, for the benefit of the Certificateholders, to review, or that it has reviewed pursuant to Section 2.01 (or to cause the Custodian to review or that it has caused the Custodian to have reviewed) each Mortgage File on or prior to the Closing Date, with respect to each Initial Mortgage Loan or the Subsequent Transfer Date, with respect to each Subsequent Mortgage Loan (or, with respect to any document delivered after the Startup Day, Mortgage Loan (or, with respect to any Qualified Substitute Mortgage, within 45 days of receipt and with respect to any Qualified Substitute Mortgage, within 45 days after the assignment thereof). The Trustee further agrees, for the benefit of the Certificateholders, to certify to the Depositor, the Master Servicer and the NIMS Insurer in substantially the form attached hereto as Exhibit F-1, within 45 days after the Closing Date, with respect to each Initial Mortgage Loan and the Subsequent Transfer Date, with respect to each Subsequent Mortgage Loan (or, with respect to any document delivered after the Startup Day, within 45 days of receipt and with respect to any Qualified Substitute Mortgage, within 45 days after the assignment thereof) that, as to each Mortgage Loan listed in the Mortgage Loan Schedule (other than any Mortgage Loan paid in full or any Mortgage Loan specifically identified in the exception report annexed thereto as not being covered by such certification), (i) all documents required to be delivered to it pursuant Section 2.01 of this Agreement are in its possession, (ii) such documents have been reviewed by it and have not been mutilated, damaged or torn and relate to such Mortgage Loan and (iii) based on its examination and only as to the foregoing, the information set forth in the Mortgage Loan Schedule that corresponds to items (1) and (2) of the Mortgage Loan Schedule accurately reflects information set forth in the Mortgage File. It is herein acknowledged that, in conducting such review, the Trustee (or the Custodian, as applicable) is under no duty or obligation to inspect, review or examine any such documents, instruments, certificates or other papers to determine that they are genuine, enforceable, or appropriate for the represented purpose or that they have actually been recorded or that they are other than what they purport to be on their face.

56

<PAGE>

Prior to the first anniversary date of this Agreement the Trustee shall deliver (or cause the Custodian to deliver) to the Depositor, the Master Servicer and the NIMS Insurer a final certification in the form annexed hereto as Exhibit F-2 evidencing the completeness of the Mortgage Files, with any applicable exceptions noted thereon.

If in the process of reviewing the Mortgage Files and making or preparing, as the case may be, the certifications referred to above, the Trustee (or the Custodian, as applicable) finds any document or documents constituting a part of a Mortgage File to be missing or defective in any material respect, at the conclusion of its review the Trustee shall so notify the Originator the Depositor, the NIMS Insurer and the Master Servicer. In addition, upon the discovery by the Originator, the Depositor, the NIMS Insurer or the Master Servicer (or upon receipt by the Trustee of written notification of such breach) of a breach of any of the representations and warranties made by the Originator in the Mortgage Loan Purchase Agreement in respect of any Mortgage Loan which materially adversely affects such Mortgage Loan or the interests of the related Certificateholders in such Mortgage Loan, the party discovering such breach shall give prompt written notice to the other parties to this Agreement.

The Depositor and the Trustee intend that the assignment and transfer herein contemplated constitute a sale of the Mortgage Loans, the

6/24/2012 10:54 PM

related Mortgage Notes and the related documents, conveying good title thereto free and clear of any liens and encumbrances, from the Depositor to the Trustee in trust for the benefit of the Certificateholders and that such property not be part of the Depositor's estate or property of the Depositor in the event of any insolvency by the Depositor. In the event that such conveyance is deemed to be, or to be made as security for, a loan, the parties intend that the Depositor shall be deemed to have granted and does hereby grant to the Trustee a first priority perfected security interest in all of the Depositor's right, title and interest in and to the Mortgage Loans, the related Mortgage Notes and the related documents, and that this Agreement shall constitute a security agreement under applicable law.

SECTION 2.03. Repurchase or Substitution of Mortgage Loans by the Originator.

(a) Upon discovery or receipt of written notice of any materially defective document in, or that a document is missing from, a Mortgage File or of the breach by the Originator of any representation, warranty or covenant under the Mortgage Loan Purchase Agreement in respect of any Mortgage Loan which materially adversely affects the value of such Mortgage Loan or the interest therein of the Certificateholders, the Trustee shall promptly notify the Originator, the NIMS Insurer and the Master Servicer of such defect, missing document or breach and request that the Originator deliver such missing document or cure such defect or breach within 120 days from the date the Originator was notified of such missing document, defect or breach, and if the Originator does not deliver such missing document or cure such defect or breach in all material respects during such period, the Trustee shall enforce the Originator's obligation under the Mortgage Loan Purchase Agreement and cause the Originator to repurchase such Mortgage Loan from the Trust Fund at the Purchase Price on or prior to the Determination Date following the expiration of such 120 day period (subject to Section 2.03(e)); provided that, in connection with any such breach that could not reasonably have been cured within such 120 day period, if the Originator shall have commenced to cure such breach within such 120 day period, the Originator shall be permitted to proceed thereafter

57

<PAGE>

diligently and expeditiously to cure the same within the additional period provided under the Mortgage Loan Purchase Agreement. The Purchase Price for the repurchased Mortgage Loan shall be deposited in the Collection Account, and the Trustee, upon receipt of written certification from the Master Servicer of such deposit, shall release to the Originator the related Mortgage File and shall execute and deliver such instruments of transfer or assignment, in each case without recourse, as the Originator shall furnish to it and as shall be necessary to vest in the Originator any Mortgage Loan released pursuant hereto and the Trustee shall have no further responsibility with regard to such Mortgage File (it being understood that the Trustee shall have no responsibility for determining the sufficiency of such assignment for its intended purpose). In lieu of repurchasing any such Mortgage Loan as provided above, the Originator may cause such Mortgage Loan to be removed from the Trust Fund (in which case it shall become a Deleted Mortgage Loan) and substitute one or more Qualified Substitute Mortgage Loans in the manner and subject to the limitations set forth in Section 2.03(d). It is understood and agreed that the obligation of the Originator to cure or to repurchase (or to substitute for) any Mortgage Loan as to which a document is missing, a material defect in a constituent document exists or as to which such a breach has occurred and is continuing shall constitute the sole remedy against the Originator respecting such omission, defect or breach available to the Trustee on behalf of the Certificateholders.

(b) Within 90 days of the earlier of discovery by the Depositor or receipt of notice by the Depositor of the breach of any representation, warranty or covenant of the Depositor set forth in Section 2.06 which materially and adversely affects the interests of the Certificateholders in any Mortgage Loan, the Depositor shall cure such breach in all material respects.

(c) Within 90 days of the earlier of discovery by the Master Servicer or receipt of notice by the Master Servicer of the breach of any representation, warranty or covenant of the Master Servicer set forth in Section 2.05 which materially and adversely affects the interests of the Certificateholders in any Mortgage Loan, the Master Servicer shall cure such breach in all material respects.

(d) Any substitution of Qualified Substitute Mortgage Loans for Deleted Mortgage Loans made pursuant to Section 2.03(a) must be effected prior to the last Business Day that is within two years after the Closing Date.

SECTION 8.12. Trustee May Enforce Claims Without Possession of
Certificates.

(a) All rights of action and claims under this Agreement or
the Certificates may be prosecuted and enforced by the Trustee without the
possession of any of the Certificates or the production thereof in any
proceeding relating thereto, and such proceeding instituted by the Trustee shall
be brought in its own name or in its capacity as Trustee for the benefit of all
Holders of such Certificates, subject to the provisions of this Agreement. Any
recovery of judgment shall, after provision for the payment of the reasonable
compensation, expenses, disbursement and advances of the Trustee, its agents and
counsel, be for the ratable benefit of the Certificateholders in respect of
which such judgment has been recovered.

(b) The Trustee shall afford the Seller, the Originator, the
Depositor, the Master Servicer, the NIMS Insurer and each Certificateholder upon
reasonable notice during normal business hours, access to all records maintained
by the Trustee in respect of its duties hereunder and access to officers of the
Trustee responsible for performing such duties. Upon request, the Trustee shall
furnish the Depositor, the Master Servicer, the NIMS Insurer and any requesting
Certificateholder with its most recent financial statements. The Trustee shall
cooperate fully with the Seller, the Originator the Master Servicer, the
Depositor and such Certificateholder and shall make available to the Seller, the
Originator, the Master Servicer, the Depositor, the NIMS Insurer and such
Certificateholder for review and copying such books, documents or records as may
be requested with respect to the Trustee's duties hereunder. The Seller, the
Originator, the Depositor, the Master Servicer and the Certificateholders shall
not have any responsibility or liability for any action or failure to act by the
Trustee and are not obligated to supervise the performance of the Trustee under
this Agreement or otherwise.

SECTION 8.13. Suits for Enforcement.

In case a Master Servicer Event of Termination or other
default by the Master Servicer or the Depositor hereunder shall occur and be
continuing, the Trustee, shall, at the direction of the Majority
Certificateholders or the NIMS Insurer, or may, proceed to protect and enforce
its rights and the rights of the Certificateholders or the NIMS Insurer under
this Agreement by a suit, action or proceeding in equity or at law or otherwise,
whether for the specific performance of any covenant or agreement contained in
this Agreement or in aid of the execution of any power granted in this Agreement
or for the enforcement of any other legal, equitable or other remedy, as the
Trustee, being advised by counsel, and subject to the foregoing, shall deem most
effectual to protect and enforce any of the rights of the Trustee, the NIMS
Insurer and the Certificateholders.

SECTION 8.14. Waiver of Bond Requirement.

The Trustee shall be relieved of, and each Certificateholder
hereby waives, any requirement of any jurisdiction in which the Trust, or any
part thereof, may be located that the Trustee post a bond or other surety with
any court, agency or body whatsoever.

SECTION 8.15. Waiver of Inventory, Accounting and Appraisal
Requirement.

141

<PAGE>

The Trustee shall be relieved of, and each Certificateholder
hereby waives, any requirement of any jurisdiction in which the Trust, or any
part thereof, may be located that the Trustee file any inventory, accounting or
appraisal of the Trust with any court, agency or body at any time or in any
manner whatsoever.

142

<PAGE>

ARTICLE IX

REMIC ADMINISTRATION

SECTION 9.01. REMIC Administration.

(a) REMIC elections as set forth in the Preliminary Statement shall be made by the Trustee on Form 1066 or other appropriate federal tax or information return for the taxable year ending on the last day of the calendar year in which the Certificates are issued. The regular interests and residual interest in each REMIC shall be as designated in the Preliminary Statement.

(b) The Closing Date is hereby designated as the "Startup Day" of each REMIC within the meaning of section 860G(a)(9) of the Code.

(c) The Master Servicer shall pay any and all tax related expenses (not including taxes) of each REMIC, including but not limited to any professional fees or expenses related to audits or any administrative or judicial proceedings with respect to each REMIC that involve the Internal Revenue Service or state tax authorities, but only to the extent that (i) such expenses are ordinary or routine expenses, including expenses of a routine audit but not expenses of litigation (except as described in (ii)); or (ii) such expenses or liabilities (including taxes and penalties) are attributable to the negligence or willful misconduct of the Master Servicer in fulfilling its duties hereunder. The Master Servicer shall be entitled to reimbursement of expenses to the extent provided in clause (i) above from the Collection Account.

(d) The Trustee shall prepare, sign and file, all of the REMICs' federal and state tax and information returns as the direct representative each REMIC created hereunder. The expenses of preparing and filing such returns shall be borne by the Trustee.

(e) The Holder of the Class R Certificate at any time holding the largest Percentage Interest thereof shall be the "tax matters person" as defined in the REMIC Provisions (the "Tax Matters Person") with respect to each REMIC and shall act as Tax Matters Person for each REMIC. The Trustee, as agent for the Tax Matters Person, shall perform on behalf of each REMIC all reporting and other tax compliance duties that are the responsibility of such REMIC under the Code, the REMIC Provisions, or other compliance guidance issued by the Internal Revenue Service or any state or local taxing authority. Among its other duties, if required by the Code, the REMIC Provisions, or other such guidance, the Trustee, as agent for the Tax Matters Person, shall provide (i) to the Treasury or other governmental authority such information as is necessary for the application of any tax relating to the transfer of a Residual Certificate to any disqualified person or organization and (ii) to the Certificateholders such information or reports as are required by the Code or REMIC Provisions. The Trustee, as agent for the Tax Matters Person, shall represent each REMIC in any administrative or judicial proceedings relating to an examination or audit by any governmental taxing authority, request an administrative adjustment as to any taxable year of any REMIC, enter into settlement agreements with any government taxing agency, extend any statute of limitations relating to any item of any REMIC and otherwise act on behalf of any REMIC in relation to any tax matter involving the Trust.

143

<PAGE>

(f) The Trustee, the Master Servicer and the Holders of Certificates shall take any action or cause the REMIC to take any action necessary to create or maintain the status of each REMIC as a REMIC under the REMIC Provisions and shall assist each other as necessary to create or maintain such status. Neither the Trustee, the Master Servicer nor the Holder of any Residual Certificate shall take any action, cause any REMIC created hereunder to take any action or fail to take (or fail to cause to be taken) any action that, under the REMIC Provisions, if taken or not taken, as the case may be, could (i) endanger the status of such REMIC as a REMIC or (ii) result in the imposition of a tax upon such REMIC (including but not limited to the tax on prohibited transactions as defined in Code Section 860F(a)(2) and the tax on prohibited contributions set forth on Section 860G(d) of the Code) (either such event, an "Adverse REMIC Event") unless the Trustee, the NIMS Insurer and the Master Servicer have received an Opinion of Counsel (at the expense of the party seeking to take such action) to the effect that the contemplated action will not endanger such status or result in the imposition of such a tax. In addition, prior to taking any action with respect to any REMIC created hereunder or the assets therein, or causing such REMIC to take any action, which is not expressly permitted under the terms of this Agreement, any Holder of a Residual Certificate will consult with the Trustee, the NIMS Insurer and the Master Servicer, or their respective designees, in writing, with respect to whether such action could cause an Adverse REMIC Event to occur with respect to any

REMIC, and no such Person shall take any such action or cause any REMIC to take
any such action as to which the Trustee, the NIMS Insurer or the Master Servicer
has advised it in writing that an Adverse REMIC Event could occur.

(g) Each Holder of a Residual Certificate shall pay when due
any and all taxes imposed on each REMIC created hereunder by federal or state
governmental authorities. To the extent that such Trust taxes are not paid by a
Residual Certificateholder, the Trustee shall pay any remaining REMIC taxes out
of current or future amounts otherwise distributable to the Holder of the
Residual Certificate in the REMICs or, if to such amounts are available, out of
other amounts held in the Distribution Account, and shall reduce amounts
otherwise payable to Holders of regular interests in the related REMIC. Subject
to the foregoing, in the event that a REMIC incurs a state or local tax,
including franchise taxes, as a result of a determination that such REMIC is
domiciled in the State of California for state tax purposes by virtue of the
location of the Master Servicer, the Master Servicer agrees to pay on behalf of
such REMIC when due, any and all state and local taxes imposed as a result of
such a determination, in the event that the Holder of the related Class R
Certificate fails to pay such taxes, if any, when imposed.

(h) The Trustee, as agent for the Tax Matters Person, shall,
for federal income tax purposes, maintain books and records with respect to each
REMIC created hereunder on a calendar year and on an accrual basis.

(i) No additional contributions of assets shall be made to any
REMIC created hereunder, except as expressly provided in this Agreement with
respect to eligible substitute mortgage loans.

(j) Neither the Trustee nor the Master Servicer shall enter
into any arrangement by which any REMIC created hereunder will receive a fee or
other compensation for services.

144

<PAGE>

(k) On or before April 15 of each calendar year beginning in
2003, the Master Servicer shall deliver to the NIMS Insurer, the Trustee and
each Rating Agency an Officers' Certificate stating the Master Servicer's
compliance with the provisions of this Section 9.01.

(j) The Trustee will apply for an Employee Identification
Number from the Internal Revenue Service via a Form SS-4 or other acceptable
method for all tax entities and shall complete the Form 8811.

SECTION 9.02. Prohibited Transactions and Activities.

Neither the Depositor, the Master Servicer nor the Trustee
shall sell, dispose of, or substitute for any of the Mortgage Loans, except in a
disposition pursuant to (i) the foreclosure of a Mortgage Loan, (ii) the
bankruptcy of the Trust Fund, (iii) the termination of any REMIC created
hereunder pursuant to Article X of this Agreement, (iv) a substitution pursuant
to Article II of this Agreement or (v) a repurchase of Mortgage Loans pursuant
to Article II of this Agreement, nor acquire any assets for any REMIC, nor sell
or dispose of any investments in the Distribution Account for gain, nor accept
any contributions to either REMIC after the Closing Date, unless it and the NIMS
Insurer have received an Opinion of Counsel (at the expense of the party causing
such sale, disposition, or substitution) that such disposition, acquisition,
substitution, or acceptance will not (a) affect adversely the status of any
REMIC created hereunder as a REMIC or of the interests therein other than the
Residual Certificates as the regular interests therein, (b) affect the
distribution of interest or principal on the Certificates, (c) result in the
encumbrance of the assets transferred or assigned to the Trust Fund (except
pursuant to the provisions of this Agreement) or (d) cause any REMIC created
hereunder to be subject to a tax on prohibited transactions or prohibited
contributions pursuant to the REMIC Provisions.

SECTION 9.03. Indemnification with Respect to Certain Taxes
and Loss of REMIC Status.

(a) In the event that any REMIC fails to qualify as a REMIC,
loses its status as a REMIC, or incurs federal, state or local taxes as a result
of a prohibited transaction or prohibited contribution under the REMIC
Provisions due to the negligent performance by the Master Servicer of its duties
and obligations set forth herein, the Master Servicer shall indemnify the NIMS
Insurer, the Trustee and the Trust Fund against any and all losses, claims,
damages, liabilities or expenses ("Losses") resulting from such negligence;

provided, however, that the Master Servicer shall not be liable for any such Losses attributable to the action or inaction of the Trustee, the Depositor or the Holder of such Class R Certificate, as applicable, nor for any such Losses resulting from misinformation provided by the Holder of such Class R Certificate on which the Master Servicer has relied. The foregoing shall not be deemed to limit or restrict the rights and remedies of the Holder of such Class R Certificate now or hereafter existing at law or in equity. Notwithstanding the foregoing, however, in no event shall the Master Servicer have any liability (1) for any action or omission that is taken in accordance with and in compliance with the express terms of, or which is expressly permitted by the terms of, this Agreement, (2) for any Losses other than arising out of a negligent performance by the Master Servicer of its duties and obligations set forth herein, and (3) for any special or consequential damages to Certificateholders (in addition to payment of principal and interest on the Certificates).

145

<PAGE>

        (b) In the event that any REMIC fails to qualify as a REMIC, loses its status as a REMIC, or incurs federal, state or local taxes as a result of a prohibited transaction or prohibited contribution under the REMIC Provisions due to the negligent performance by the Trustee of its duties and obligations set forth herein, the Trustee shall indemnify the NIMS Insurer and the Trust Fund against any and all Losses resulting from such negligence; provided, however, that the Trustee shall not be liable for any such Losses attributable to the action or inaction of the Master Servicer, the Depositor or the Holder of such Class R Certificate, as applicable, nor for any such Losses resulting from misinformation provided by the Holder of such Class R Certificate on which the Trustee has relied. The foregoing shall not be deemed to limit or restrict the rights and remedies of the Holder of such Class R Certificate now or hereafter existing at law or in equity. Notwithstanding the foregoing, however, in no event shall the Trustee have any liability (1) for any action or omission that is taken in accordance with and in compliance with the express terms of, or which is expressly permitted by the terms of, this Agreement, (2) for any Losses other than arising out of a negligent performance by the Trustee of its duties and obligations set forth herein, and (3) for any special or consequential damages to Certificateholders (in addition to payment of principal and interest on the Certificates).

146

<PAGE>

ARTICLE X

TERMINATION

        SECTION 10.01.    Termination.

        (a) The respective obligations and responsibilities of the Master Servicer, the Depositor and the Trustee created hereby (other than the obligation of the Trustee to make certain payments to Certificateholders after the final Distribution Date and the obligation of the Master Servicer to send certain notices as hereinafter set forth) shall terminate upon notice to the Trustee upon the earliest of (i) the Distribution Date on which the Certificate Principal Balances of the Regular Certificates have been reduced to zero, (ii) the final payment or other liquidation of the last Mortgage Loan in the Trust and (iii) the optional purchase by the Master Servicer or the NIMS Insurer of the Mortgage Loans as described below. Notwithstanding the foregoing, in no event shall the trust created hereby continue beyond the expiration of 21 years from the death of the last survivor of the descendants of Joseph P. Kennedy, the late ambassador of the United States to the Court of St. James's, living on the date hereof.

        The Master Servicer (or if the Master Servicer fails to exercise such option, the NIMS Insurer) may, at its option, terminate this Agreement on any date on which the aggregate of the Principal Balances of the Mortgage Loans (after giving effect to scheduled payments of principal due during the related Due Period, to the extent received or advanced, and unscheduled collections of principal received during the related Prepayment Period) on such date is equal to or less than 10% of the sum of the aggregate Principal Balances of the Initial Mortgage Loans on the Cut-off Date and the

# EXHIBIT

## "F"

Exhibit "F"

[*1]

| Wells Fargo Bank, N.A. v Erobobo |
| --- |
| 2013 NY Slip Op 50675(U) |
| Decided on April 29, 2013 |
| Supreme Court, Kings County |
| Saitta, J. |
| Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431. |
| This opinion is uncorrected and will not be published in the printed Official Reports. |

Decided on April 29, 2013

### Supreme Court, Kings County

Wells Fargo Bank, N.A., as Trustee for ABFC 2006-OPT3 TRUST, ABFC ASSET-BACKED CERTIFICATES, SERIES 2006-OPT3, Plaintiff,

against

Rotimi Erobobo, THE CITY OF NEW YORK ENVIRONMENTAL CONTROL BOARD, "JOHN DOE" AND "JANE DOE" said names being fictitious, it being the intention of Plaintiff to designate any and all occupants of the premises being foreclosed herein, Defendants.

31648/2009

Plaintiffs Attorney

Fein, Such & Crane, LLP.

28 East Main Street, Suite 1800

Rochester, New York 14614

(585) 232-7400

Defendants Attorney

Kenneth S. Pesinger, Esq.

3601 Hempstead Turnpike, Suite 305

Levittown, New York 11756

Wayne P. Saitta, J.

    Plaintiff, WELLS FARGO BANK, N.A., as Trustee for ABFC 2006-OPT3 TRUST, ABFC ASSET-BACKED CERTIFICATES, SERIES 2006-OPT3, (herein "Plaintiff"), moves this Court for an Order for summary judgment pursuant to CPLR 3212.

    Upon reading the Notice of Motion by V.S. Vilkhu, Esq., Attorney for Plaintiff, WELLS [*2]FARGO BANK, N.A., as Trustee for ABFC 2006-OPT3 TRUST, ABFC ASSET-BACKED CERTIFICATES, SERIES 2006-OPT3, dated May 11th, 2010, together with the Attorney Affidavit of V.S. Vilkhu, Esq., dated May 11th, 2010, and all exhibits annexed thereto; the Memorandum of Law by V.S. Vilkhu, Esq., undated; the Affirmation in Opposition by Kenneth S. Pelsinger, Esq., Attorney for Defendant ROTIMI EROBOBO, dated November 19th, 2010; the Supplemental Affirmation in Opposition by Kenneth S. Pelsinger, Esq., dated August 3rd, 2011, and all exhibits annexed thereto; the Reply Affirmation of V.S. Vilkhu, Esq., dated January 24th, 2011, and all exhibits annexed thereto; the Memorandum of Law in Opposition to Plaintiff's Motion for Summary Judgment by Kenneth S. Pelsinger, Esq., dated November 9th, 2011; the Pooling and Servicing Agreement of WELLS FARGO BANK, N.A., as Trustee for ABFC 2006-OPT3 TRUST, ABFC ASSET-BACKED CERTIFICATES, SERIES 2006-OPT3, dated October 1st, 2006; and after argument of counsel and due deliberation thereon, Plaintiff's motion is denied for the reasons set forth below.

## FACTS

Plaintiff brings this action to foreclose on a mortgage, dated July 16, 2006, which secured a loan of $420,000 issued to the Defendant by Alliance Mortgage Banking Corp., ("Alliance"). On July 17, 2006, Alliance assigned the note and mortgage to Option One Mortgage Corporation, ("Option One"). Option One then assigned the note and mortgage to Plaintiff by assignment executed July 15, 2008. Plaintiff is the trustee for a securitized trust entitled ABFC 2006-OPT3 TRUST, ABFC, ASSET BACKED CERTIFICATES, SERIES 2006-OPT3, ("the Trust").

The Trust was formed as a vehicle for purchasing mortgage backed securities. The Trust is subject to the terms of a Pooling and Servicing Agreement, ("the PSA"). The PSA was signed by the Depositor, Asset Backed Funding Corporation ("ABFC"), by the Servicer, Option One, and by the Trustee, WELLS FARGO BANK, NA, and is dated October 1, 2006.The PSA set forth the manner in which mortgages would be purchased by the trust, as well as the duties of the trustee.

Section 2.01, subsection 1 of the PSA requires that transfer and assignment of mortgages must be effected by hand delivery, for deposit with the Trustee with the original note endorsed in blank.

Section 2.05 of the PSA requires that the Depositor transfer all right, title, interest in the mortgages to the Trustee, on behalf of the trust, as of the Closing Date. The Closing Date as provided in the PSA is November 14, 2006.

Option One assigned Defendant's mortgage loan to the Plaintiff, as the Trustee, on July 15, 2008, approximately eighteen months after the trust had closed.

Plaintiff commenced this action on December 10, 2009, and alleged that it possessed the Note with an allonge on the date that this foreclosure action was commenced. Defendant, pro se, filed an answer containing a general denial.

Plaintiff filed a motion for summary judgment on May 11, 2010. After Defendant answered, he obtained counsel and opposed Plaintiff's motion for summary judgment.

**ARGUMENTS**[*3]Plaintiff argues it is entitled to summary judgment to foreclose because it was in possession of the note and mortgage at the time the action was filed.

Defendant argues that Plaintiff is not in fact the owner or holder of the note because it obtained the note and mortgage after the trust had closed in violation of the terms of the PSA,

and therefore the acquisition of the note and mortgage is void. Defendant also argues that Plaintiff obtained the mortgage and note without an intervening assignment, in violation of the PSA.

Plaintiff argues that Defendant's claim that Plaintiff does not own the note and mortgage amounts to a standing argument, and because Defendant failed to raise standing in his answer as an affirmative defense or pre answer motion, he cannot do so now.

### ANALYSIS

Defendant contested whether Plaintiff owns the mortgage and note by answering with a general denial of the facts alleged in the complaint, which included Plaintiff's allegation that it owns the note and mortgage.

Many decisions treat the question of whether the Plaintiff in a foreclosure action owns the note and mortgage as if it were a question of standing and governed by CPLR 3211(e). *Citigroup Global Markets Realty Corp. v. Randolph Bowling*, 25 Misc 3d 1244(A), 906 N.Y.S.2d 778 (Sup. Ct. Kings Cty 2009); *Federal Natl. Mtge. Assn. v. Youkelsone*, 303 AD2d 546, 546—547 (2d Dept 2003); *Nat'l Mtge. Consultants v. Elizaitis*, 23 AD3d 630, 631 (2d Dept 2005); *Wells Fargo Bank, N.A. v. Marchione*, 2009 NY Slip Op 7624, (2d Dept 2009).

However, Plaintiff's ownership of the note is not an issue of standing but an element of its cause of action which it must plead and prove.

The term "standing" has been applied to two legally distinct concepts. The first is legal capacity, or authority to sue. The second is whether a party has asserted a sufficient interest in the outcome of a dispute.

Standing and capacity to sue are related, but distinguishable legal concepts. Capacity requires an inquiry into the litigant's status, i.e., its "power to appear and bring its grievance before the court", while standing requires an inquiry into whether the litigant has "an interest in the claim at issue in the lawsuit that the law will recognize as a sufficient predicate for determining the issue." *Wells Fargo Bank Minnesota, Nat. Ass'n v Mastropaolo*, 42 AD3d 239, 242 (2d Dept 2007) (internal citations omitted). Both concepts can result in dismissal on a pre answer motion by the defendant and are waived if not raised in a timely manner.

whether it has an interest in the dispute. Whether a party has a sufficient interest in the dispute is determined by the facts alleged in the complaint, not whether Plaintiff can prove the allegations. *Wall St. Associates v. Brodsky*, 257 AD2d 526, 684 N.Y.S.2d 244 (1st Dept 1999), *Kempf v. Magida*, 37 AD3d 763, 764, 832 N.Y.S.2d 47, 49 (2nd Dept 2007). For the purpose of determining whether a party has sufficient interest in the case the allegations are assumed to be true.

This issue is not analogous to the issue of whether citizens have standing to seek judicial intervention in response to what they believe to be governmental actions which would impair the rights of members of society, or a particular group of citizens, (e.g. *Schulz v. State*, 81 NY2d 336, 343, 615 N.E.2d 953, 954 (1993), or whether registered voters have standing to challenge the denial of the right to vote in a referendum pursuant to Section 11 of Article VII of the State Constitution, or whether commercial fishermen have standing to complain of the pollution of the waters from which they derive their living, see also *Leo v. Gen. Elec. Co.,* 145 AD2d 291, 294, 538 N.Y.S.2d 844, 847 (2nd Dept 1989). The issue of standing in these types of cases turn on whether the claimants have an interest sufficiently distinct from society in general.

Foreclosure actions implicate a concrete interest specific to a plaintiff, and the determination must be made as to whether it has been aggrieved and is therefore entitled to receive monetary damages for the alleged breach of the law.

The Plaintiff herein pled that it owns the note and mortgage and asserts the right to foreclose on the mortgage which it asserts is in default. If it is successful in proving its claims, then it is entitled to receive the proceeds of the sale of the mortgaged property. The objection that the Plaintiff in fact does not own the note and mortgage is not a defense based on a lack of standing. Here Defendant does not say insufficient facts were alleged. Defendant's argument is that the facts alleged are not true. It is not a question of whether the Plaintiff has alleged a sufficient interest in the dispute, but of whether Plaintiff can prove its prima facie case. [*6]

Unlike standing, denial of a Plaintiff's claim that it owns the note and mortgage is not an affirmative defense because it is a denial of an allegation in the complaint that is an element of Plaintiff's cause of action.

In a foreclosure case, the Plaintiff must plead and prove as part of its prima facie case that it owns the note and mortgage and has the right to foreclose. *Wells Fargo Bank, N.A.*, 80 AD3d 753, 915 N.Y.S.2d 569 (2d Dept 2011); *Argent Mtge. Co., LLC v. Mentesana, 79 AD3d 1079*, 915 N.Y.S.2d 591 (2d Dept 2010); *Campaign v Barba*, 23 AD3d 327, 805 NYS2d 86 (2nd Dept 2005).Defendant herein filed a pro se answer containing a general denial, which is a denial of all of Plaintiff's allegations, including the allegation in paragraph 11 that it owns the note.

CPLR 3018(b) provides that an affirmative defense is any matter "which if not pleaded would be likely to take the adverse party by surprise" or "would raise issues of fact not appearing on the face of a prior pleading".

CPLR 3018(b) also lists some common affirmative defenses, although the list is not exhaustive. The list of affirmative defenses in CPLR 3018(b) are those which raise issues such as res judicata or statute of limitations which are based on facts not previously alleged in the pleadings.

Affirmative defenses are those which posit that the adverse party is not entitled to relief, by reason of excuse or exception, even assuming the truth of the allegations made in the complaint.

"The defendant has the burden of proof of affirmative defenses, which in effect assume the truth of the allegations of the complaint and present new matter in avoidance thereof." 57 NY Jur. 2d Evidence and Witnesses 165.

Defendant's general denial asserts that Plaintiff is not entitled to relief because the facts alleged in the complaint are not true.

In *Hoffstaedter v. Lichtenstein*, 203 App.Div. 494, 496, 196 N.Y.S. 577 (1st Dept 1922), the First Department held that the general denial put the allegations in the plaintiff's complaint in issue. In that case, the defendant executed a note in favor of the plaintiff as a promise to pay for certain goods. When plaintiff brought an action to recover on the note, the defendant answered with a general denial. It went on to state that "[i]t is elementary that under a general denial a defendant may disprove any fact which the plaintiff is required to prove to establish a prima facie cause of action." Id., at 578.

The Court of Appeals cited *Hoffstaedter v. Lichtenstein* in holding that a general denial puts in issue those matters already pled. *Munson v. New York Seed Imp. Co-op., Inc.*, 64 NY2d 985, 987, 478 N.E.2d 180, 181 (1985).The general denials contained in the answer enable defendant to controvert the facts upon which the plaintiff bases her right to recover. *Strook Plush Company v. Talcott*, 129 AD 14, 113 NYS 214 (2nd Dept 1908). A general denial is sufficient to challenge all of the allegations in a complaint. *Bodine v. White*, 98 NYS 232, 233 (App. Term 1906).The Second Department in *Gulati v. Gulati*, 60 AD3d 810, 811-12, 876 N.Y.S.2d 430, 432-33 (2nd Dept 2009), held it was that where a claim would not take the plaintiff by surprise and "does not raise issues of fact not [*7]appearing on the face of the complaint", a denial of the allegations in the plaintiff's complaint was sufficient. It held that where the plaintiff alleged as an element of her prima facie case that the defendant abandoned the marital residence without cause or provocation, and the defendant denied these allegations in his answer, defendant did not need to further allege abandonment as an affirmative defense.

The Fourth Department in *Stevens v. N. Lights Associates,* 229 AD2d 1001, 645 N.Y.S.2d 193, 194 (4th Dept 1996), found that a denial by defendant that it was in control of the premises where plaintiff fell did not need to be separately pled as a defense, as the denial of control did not raise any issue of fact which had not already been pled in the complaint. See also *Scully v. Wolff,* 56 Misc. 468, 107 N.Y.S. 181 (App. Term 1907), *Bodine v. White,* 98 N.Y.S. 232 (App. Term 1906).

In this case, Defendant's contesting Plaintiff's claim in the complaint that it owns the note and mortgage could not take the Plaintiff by surprise as a general denial contests Plaintiff's factual allegations in the complaint itself, and does not rely upon extrinsic facts.Since ownership of the note was pled in the complaint and is an element of the Plaintiff's cause of action, Defendant did not waive the defense that Plaintiff did not own the note, because he made a general denial to the factual allegations contained in the complaint.

In fact, the identity of the owner of the note and mortgage is information that is often in the exclusive possession of the party seeking to foreclose. Mortgages are routinely transferred through MERS, without being recorded. The notes underlying the mortgages, as negotiable instruments, are negotiated by mere delivery without a recorded assignment or notice to the borrower. A defendant has no method to reliably ascertain who in fact owns the note, within the narrow time frame allotted to file an answer. In light of these facts and the

fact that Defendant contested the factual allegations asserted in Plaintiff's pleading, Defendant's general denial is sufficient to contest whether Plaintiff owns the note and mortgage.

In response to Plaintiff's motion, Defendant contends that Plaintiff is not entitled to summary judgment as it does not own the note and mortgage, because the purported transfer to Plaintiff was void as it violated the terms of the PSA which governs acquisitions by the Trust.

The Plaintiff in this case is Trustee of an asset backed certificate trust. The trust acquires mortgages, pools them and then issues securities secured or backed by the mortgages it holds. The investors receive interest or principle, or both, from the mortgages assigned to those specific securities or obligations.

The manner in which the trust acquires the mortgages, issues the securities and pays the income from the mortgages to investors, is governed by the trust's pooling and servicing agreement (PSA).

The Plaintiff trust is organized as a Real Estate Mortgage Investment Conduit (REMIC). As a REMIC, the trust's investors receive significant tax benefits, but to receive those benefits, the trust must comply with the US Treasury regulations governing REMICS. [*8]26 USCA §860-D-1. The terms of the PSA require that the trust does not operate or take any action that would jeopardize its REMIC status. Section 9.01(f) of the PSA.

Article 9 of the PSA, section 9.01(b) provides that the closing date is designated as the "start up day" of each REMIC, and lists the closing date as November 14, 2006. Pursuant to 26 USCA §860-G-(b)(9), the "start up day" of a REMIC is the day upon which the REMIC issues all of its regular and residual interests.

The PSA specifically requires the Depositor to have transferred all of the interest in the mortgage notes to the Trustee on behalf of the trust as of the closing date. PSA Article II, Section 2.05 (iii).

Plaintiff asserts that the transfer of the note herein is void because the note was acquired after the closing date in violation of the terms of the PSA.

Mere recital of assignment, holding or receipt of an asset is insufficient to transfer an asset to a trust. The grantor must actually transfer the asset. EPTL §7-1.18.

The assignment of the note and the mortgage which affected the transfer was dated July 16, 2008, however, pursuant to the terms of the PSA the trust closed on November 14, 2006.

Section 9.02 of the PSA specifically prohibits the acquisition of any asset for a REMIC part of the fund after the closing date unless the party permitting the acquisition and the NIMS (net interest margin securities) Insurer have received an Opinion letter from counsel, at the party's expense, that the acceptance of the asset will not affect the REMIC's status. No such letter has been provided to show compliance with the requirements of the PSA. Plaintiff has provided no evidence that the trustee had authority to acquire the note and mortgage herein after the trust had closed.

Since the trustee acquired the subject note and mortgage after the closing date, the trustee's act in acquiring them exceeded its authority and violated the terms of the trust. The acquisition of a mortgage after 90 days is not a mere technicality but a material violation of the trust's terms, which jeopardizes the trust's REMIC status.

Section 9.01(f) of the PSA provides that neither the Trustee, the Servicer or Holder of the Certificates shall cause any REMIC formed under the PSA, by action or omission, to endanger the status of the REMIC or cause any imposition of tax upon the REMIC.

Since the trust was organized as a REMIC, the investors received certain tax benefits on the income that passed through the trust to them. Section 26 U.S.C.A. § 860D(a)(4) defines a REMIC as an entity that

as of the close of the 3rd month beginning after the startup day and at all times thereafter, substantially all of the assets of which consist of qualified mortgages and permitted investments.

Section 26 U.S.C.A. § 860G (a)(3)(i,ii) defines a qualified mortgage as [*9]

(A) any obligation (including any participation or certificate of beneficial ownership therein) which is principally secured by an interest in real property and which (I) is transferred to the REMIC on the startup day in exchange for regular or residual interests in the REMIC,

(ii) is purchased by the REMIC within the 3-month period beginning on the startup day if, except as provided in regulations, such purchase is pursuant to a fixed-price contract in effect on the startup day.

Thus to qualify for the REMIC tax benefits, the mortgages upon which the securities are based must be acquired by the Trust within three months of its start up date.

While section 26 U.S.C.A. § 860D(a)(4) permits a REMIC to contain some portion of non qualified mortgages, it is unclear how many unqualified mortgages are permitted without losing tax status. It is clear, however, that the late acquisition violates the terms of the PSA.

Under New York Trust Law, every sale, conveyance or other act of the trustee in contravention of the trust is void. EPTL §7-2.4. Therefore, the acceptance of the note and mortgage by the trustee after the date the trust closed, would be void.

*Conveyance from the Depositor to the Trust*

Defendant also argues that the Trustee violated the terms of the trust by acquiring the note directly from the sponsor's successor in interest rather than from the Depositor, ABFC, as required by the PSA.

In Article II, section 2.01 Conveyance of Mortgage Loans, the PSA requires that the Depositor deliver and deposit with the Trustee the original note, the original mortgage and an original assignment . The Trustee is then obligated to provide to the Depositor an acknowledgment of receipt of the assets before the closing date. PSA Article II, Section 2.01.

The rationale behind this requirement is to provide at least two intermediate levels of transfer to ensure the assets are protected from the possible bankruptcy by the originator which permits the security to be provided with the rating required for the securitization to be saleable. *Deconstructing the Black Magic of Securitized Trusts*, Roy D. Oppenheim Jacquelyn K. Trask-Rahn 41 Stetson L. Rev. 745 Stetson Law Review (Spring 2012).

Here the note and mortgage were purportedly assigned from Option One to the Plaintiff, without having been transferred to, and then from, the Depositor.

Case 4:13-cv-00183-CDL   Document 1-2   Filed 06/21/13   Page 58 of 61

The assignment of the note and mortgage from Option One rather than from the Depositor ABFC violates section 2.01 of the PSA which requires that the Depositor deliver to and deposit the original note, mortgage and assignments to the Trustee.

The assignment of the Defendant's note and mortgage, having not been assigned from the Depositor to the Trust, is therefore void as in being in contravention of the PSA. The evidence submitted by Defendant that the note was acquired after the closing date and that assignment was not made by the Depositor, is sufficient to raise questions [*10] of fact as to whether the Plaintiff owns the note and mortgage, and precludes granting Plaintiff summary judgment.

WHEREFORE, Plaintiff's motion for summary judgment is denied. This shall constitute the decision and Order of this Court.

ENTER,

_____

J S C

Return to Decision List

IN THE MUNICIPAL COURT OF COLUMBUS

STATE OF GEORGIA

FILED

MAY 29 2013

MUNICIPAL COURT
MUSCOGEE COUNTY

| | | |
|---|---|---|
| WELLS FARGO BANK, N.A. as | § | |
| Trustee for Option One Mortgage | § | |
| Loan Trust 2003-1, | § | |
| | § | |
| Plaintiff, | § | |
| v. | § | CIVIL ACTION |
| | § | FILE NUMBER: <u>MC2013CV5251.</u> |
| PEDRO BURGOS | § | |
| and ALL OTHERS, | § | MOTION TO DISMISS OR TRANSFER |
| | § | SPECIAL APPEARANCE BY DEFENDANTS |
| Defendants. | § | DEMAND FOR TRIAL BY JURY |

<u>MOTION TO DISMISS AND OR TRANSFER CASE</u>

**COMES NOW, PEDRO BURGO** and **ALL OTHERS,** the Defendants and through Special Appearance hereby files their answer and counterclaim against the above-named Plaintiff and hereby moves this Court to dismiss this case for (1) due to Defendants' defenses and counterclaim exceed the jurisdiction of this Court pursuant to **O.C.G.A. § 9-11-12(h)(f)** and (2) failure to state a claim in which relief can be granted or in the alternative to transfer this case to the Superior Court of Muscogee County due to lack of jurisdiction.

**WHEREFORE,** the Defendants hereby moves this Court to GRANT their motion because he is entitled to such relief as a matter of law.

Respectfully submitted this the _____ , day of May 2013.

Jointly Filed and Served by:

_____
Pedro Burgos, PRO SE
Attorney for the Defendant

_____
Tony L. Ware, PhD, JD, PRO SE
Attorney for the Defendant

7440 McKee Road
Upatoi, Georgia 31829
(706) 332-6881

IN THE MUNICIPAL COURT OF COLUMBUS

STATE OF GEORGIA

| | |
|---|---|
| WELLS FARGO BANK, N.A. as Trustee for Option One Mortgage Loan Trust 2003-1, | § § § § |
| Plaintiff, | § § |
| v. | § |
| PEDRO BURGOS and ALL OTHERS, | § § § |
| Defendants. | § § § |

**FILED**
MAY 29 2013
MUNICIPAL COURT
MUSCOGEE COUNTY

CIVIL ACTION
FILE NUMBER: <u>MC2013CV5251.</u>

CERTIFICATE OF SERVICE
SPECIAL APPEARANCE BY DEFENDANTS

---

## CERTFICATE OF SERVICE

**COMES NOW, PEDRO BURGOS** and **ALL OTHERS** as Pro Se and as Attorneys for the Defendant for themselves in the above-styled civil action and hereby certify that I have personally served upon Plaintiff's counsel with a copy of Defendants' (1) MOTION TO DISMISS and (2) ANSWER AND COUNTERCLAIM upon the following person to wit:

Howell A. Hall, Esq.
115 Perimeter Center, Suite 1000
Atlanta, Georgia 30346

**Respectfully submitted this the** _29th_ **, day of May 2013.**

Jointly Filed and Served by:

Pedro Burgos, PRO SE
Attorney for the Defendant

Tony L. Ware, PhD, JD, PRO SE
Attorney for the Defendant

7440 McKee Road
Upatoi, Georgia 31829
(706) 332-6881